BYRON D. CLARK, *d.b.a.* CLARK CONSTRUCTION COMPANY, v. OTTO B. ASHBACH & SONS, INC.[1]

February 19, 1954.

No. 36,175.

[1]Reported in 64 N. W. (2d) 517.

*O. A. Brecke* and *E. T. Chesnut,* for appellant.

*Faricy, Moore & Costello, Harry G. Costello, Jr.,* and *B. Warren Hart,* for respondent.

MAGNEY, COMMISSIONER.

Plaintiff appeals from an order denying his motion in the alternative for judgment notwithstanding the verdict or for a new trial.

On August 22, 1949, defendant Otto B. Ashbach & Sons, Inc., hereinafter referred to as Ashbach, agreed in writing that, in consideration of their services in negotiating a sale of three LeTourneau motor scrapers to plaintiff Byron D. Clark, it would pay Paul F.

Calihan and Bernard E. Drews $800 for the sale of each motor scraper, making a total of $2,400. It was agreed that the commission of $800 on each of the scrapers would become due and payable immediately upon receipt of the final payment from Clark on each of the graders. A conditional sales contract was entered into on the same date between Clark and Ashbach for the purchase and sale of the three motor scrapers. The agency contract also contained this provision:

"It is further agreed that in the event Mr. Byron Clark should default or, for other reasons, fail to fulfill the terms of the Conditional Sales Contract relating to the above machines, so that Otto B. Ashbach & Sons are forced or entitled to repossess same, the above parties will take over the obligations of the agreement relating to payments with the intention of owning and possessing the machines when these obligations are fulfilled. It is understood in connection with this agreement, that the above parties have read and fully understand the conditions set forth in the Conditional Sales Contract mentioned herein."

The provision above quoted contains the source of this litigation. On December 21, 1950, for $2,000 Calihan and Drews assigned to plaintiff in writing all their right, title, and interest in and to the commissions and the right to receive and collect the same. The plaintiff claims that the scrapers are fully paid for and that $2,400 is due and payable to him. For reasons to be detailed later, the defendant refused payment. At the close of the testimony the court directed a verdict for defendant on this claim.

By the terms of the conditional sales contract between Ashbach and Clark, Ashbach agreed to sell to Clark two graders for the sum of $5,600 each to be paid for as follows:

$2,200 upon execution of the contract, $1,100 to apply on each machine;

$2,200 on or before September 22, 1949, $1,100 to apply on each machine;

$2,200 on or before October 22, 1949, $1,100 to apply on each machine; and the balance of $4,600 on or before November 22, 1949, all without interest.

The contract also provided for the sale of a third grader at the same price to be delivered and paid for in full on or before November 22, 1949. Thus, all three graders were to be paid for on or before November 22, 1949. When that date arrived, Clark had paid a total of $3,300 but was unable to pay the balance. In December 1949 Clark and Ashbach entered into a new arrangement whereby Clark was to refinance the first two graders through the First Acceptance Corporation and signed a separate contract to pay for the third scraper on a new deferred payment basis. So on December 30, 1949, a new conditional sales contract was executed between Clark and Ashbach covering the first two scrapers at a total consideration of $8,672 after crediting the $3,300 already paid on the first contract. The amount represented the old balance plus refinancing charges. This contract was assigned to First Acceptance Corporation. The proceeds were turned over to Ashbach, less 10 percent withheld as a deposit. Ashbach guaranteed the payments under the new contract. Thus, Ashbach was paid in full for the first two scrapers, less the 10 percent withheld. This contract was made payable in eight monthly instalments of $1,084 each, but payments were not to begin until June 15, 1950. On January 5, 1950, another conditional sales contract was entered into by the parties covering the third grader. The purchase price was stated as $5,600 payable at the rate of $1,000 per month beginning June 1, 1950. Calihan and Drews knew nothing about the substitution of two new contracts for the original one.

Clark was also unable to make the payments under the new contracts. At one time Ashbach advanced for Clark $2,168 to the finance corporation to make the account current. Clark and Ashbach continued to do business, and there was a running account between them. Ashbach rented Clark's equipment and used it in the performances of several grading contracts. Clark's account was credited with over $9,300 for rental of equipment. The three scrapers

were actually paid for in full in September 1951 and the account closed on November 11, 1951. In addition to the credits, Ashbach paid Clark several hundred dollars by check. Numerous small items entered into the running account. Clark had possession of the scrapers during all the time. Ashbach did not demand their return and took no action to secure their return.

At some time during the latter part of their transactions, Clark presented the original commission agreement and the assignment to Ashbach or told him about it. Ashbach turned him down, saying the contract was no good and he was not interested in it. Ashbach testified that Calihan at one time came to see him and asked for his part of the commission, and Ashbach told him that Clark was in default and asked Calihan to pay up what Clark owed. From his testimony, it is difficult to tell whether the conversation took place in 1949 or 1950; but from certain statements he made in his testimony, it must have been in the fall of 1950. Whenever it was, it may not be of any importance.

On December 14, 1950, Ashbach sent Calihan and Drews each a letter in which he stated:

"* * * at this time we must ask you to see that these payments are made current by the 1st of January 1951. If the payments are not current by the 1st of January 1951, we shall be forced to look to you for immediate payment of the unpaid balance."

On January 2, 1951, he also sent them each a letter in which he stated:

"We have had no reply to this letter [letter of December 14, 1950]. Our contract with you and Clark provides that if payments and/or other terms of the contract are in default, your commission shall be forfeited.

"If the payments are not made current by January 8, 1951, we shall assume that you waive all claims to the commission due you under the terms of the contract referred to above."

On the evidence the court directed a verdict for the defendant on the claim, holding that under the evidence and the commission con-

tract Clark was not entitled to recover from Ashbach. In directing the verdict the court said:

"* * * The contract between the agents and the defendant * * * provides in effect that if there is a default in the payments under the conditional sales contracts that the agents will take over and make those payments, and assume the liability under the contract with the view of becoming the owners of the property. In December of 1950, the plaintiff being behind in payments, the defendants in writing notified the agents of a default, and demanded that they make up the payments under the contract. It is true that at that time the defendant had not repossessed the property. The agents made no reply to this communication as far as the evidence shows, which is taken, of course, as a refusal to comply with the demand. Under that situation it seems to me that the defendants are not required to do a vain thing and repossess the property and tender it to the agents. If the agents had indicated a willingness to comply with their contract then the defendant would have had to repossess the property and tender it to the agents, but the agents not having made an effort to comply with their contract I do not believe the law requires the defendants to do a vain thing and repossess the property."

The sole question here is whether the court was right in holding that Clark is not entitled to recover the commission which Ashbach had agreed to pay Calihan and Drews.

By September 1951 the three graders were paid for in full. The agency contract provides that the commission "shall become due and shall be paid to you immediately upon receipt by us from Mr. Clark of the final payments on each of the graders." The payment condition has been complied with by Clark. Payments were not made on the dates specified, and Ashbach had difficulty in making collections, but payments were actually made and Ashbach accepted them. If nothing more appeared, it is clear that Calihan and Drews would, under the terms of their agency contract, have been entitled to receive the full compensation therein provided for.

Ashbach contends, however, that under the guaranty provision found in the second paragraph of the agency contract, Calihan and Drews have forfeited their right to compensation and that Clark, as assignee, stands in no better position. His contention is that, since Clark was unable to make the payments under the first conditional sales contract, two new conditional sales contracts had to be entered into for refinancing purposes; that Clark thereafter was unable to meet the payments under the new contracts; and that the only way Ashbach could collect the payments in default was to apply rentals due from him on the use of Clark's machines. The guaranty provision, as we have already quoted, reads:

"* * * in the event * * * Clark should default or, for other reasons, fail to fulfill the terms of *the* Conditional Sales Contract relating to the above machines, so that Otto B. Ashbach & Sons are forced or entitled to repossess same, the above parties will take over the obligations of the agreement relating to payments with the intention of owning and possessing the machines when these obligations are fulfilled. It is understood in connection with this agreement, that the above parties have read and fully understand the conditions set forth in the Conditional Sales Contract mentioned herein." (Italics supplied.)

Ashbach claims that the principal purpose of the above provision of the agency contract was to assure him that, if Clark did not make payments in the amounts and at the times specified in the conditional sales contract, Calihan and Drews would make the payments without notice and that the total wilful failure of Calihan and Drews to make those payments when Clark defaulted went to the very heart of the contract and was, therefore, a fatal breach. He claims that, when a seller's agents guarantee that a purchaser will pay the purchase price as provided for in a conditional sales contract but take no action on the payment of the purchase price when the purchaser is in default in a large sum, there is a material breach of the agency contract which precludes the agents from recovering a commission. In fact, he places upon them the same obligation that

is imposed upon *del credere* agents and insists that Calihan and Drews were *del credere* agents.

■ Under the facts in this case Calihan and Drews were not *del credere* agents or factors. The term *del credere* is used only in connection with the business of factors and commission merchants. A factor may be defined as one specially employed to receive goods from a principal to sell them for a consideration called "factorage" or "commission." A factor is sometimes called a "consignee" or "commission merchant," but, by whatever term he is known, he is vested with possession, either in bulk or sample, of property for the purpose of sale. Being entrusted with the possession of property for this purpose, a factor or commission merchant is both a bailee and a sales agent of the bailor. 22 Am. Jur., Factors, § 2; Blackorby v. Friend, Crosby & Co. 134 Minn. 1, 158 N. W. 708

A *del credere* factor is one who for an additional compensation guarantees the solvency of the purchaser and the performance of the contract. 22 Am. Jur., Factors, § 39. In 35 C. J. S., Factors, § 1b (2), it is stated:

"A del credere factor or a factor with a del credere commission or agency is one who, in consideration of a higher compensation, expressly engages to pay to his principal the price of all goods sold by himself, if the purchaser fails so to do."

■ There are two fact elements lacking in the instant case to make Calihan and Drews *del credere* agents. In the first place, they were not in possession of or bailees of the scrapers which were sold. In the second place, there was no additional compensation given them for guaranteeing the solvency of Clark and the performance of his contract. Since Calihan and Drews were not *del credere* agents of Ashbach, they cannot be held absolutely liable in the first instance for the payments to be made by Clark.

Ashbach relies on D. M. Osborne & Co. v. Baker, 34 Minn. 307, 25 N. W. 606. Although it was a *del credere* situation, the court simply held that, upon the rule of *stare decisis,* the words "for value received" are a sufficient expression of the consideration within the statute of frauds.

■ It is clear to us that Calihan and Drews were not *del credere* agents. The contract they entered into was a guaranty contract but different in nature from a guaranty under a *del credere* arrangement. The guaranty here reads:

*"* * * in the event Mr. Byron Clark should default * * * the above parties will take over the obligations of the agreement relating to payments * * *."* (Italics supplied.)

In other words, if Clark should default, Calihan and Drews promise to make the payments that Clark should have made under the agreement. The primary obligation was on Clark to make the payments; Calihan and Drews promised to make the payments upon nonperformance by Clark. The contract of guaranty is an undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another and which binds the obligor to performance in the event of nonperformance by such other, the latter being bound to perform primarily. 24 Am. Jur., Guaranty, § 2. In Schmidt v. McKenzie, 215 Minn. 1, 6, 9 N. W. (2d) 1, 3, we defined a guaranty as "a collateral contract to answer for the payment of a debt or the performance of a duty in case of the default of another who is primarily liable to pay or perform the same." In the instant case, Calihan and Drews entered into a collateral contract to answer for the performance of Clark in his duty to make payments in case of his default. Clark was primarily liable.

In 24 Am. Jur., Guaranty, § 4, the author states:

"A contract of guaranty, being a collateral engagement for the performance of an undertaking of another, imports the existence of two different obligations, one being that of the principal debtor and the other that of the guarantor. * * * 'To constitute a guaranty, there must be a principal debtor or obligor.' * * *

"The debtor is not a party to the guaranty, and the guarantor is not a party to the principal obligation. The undertaking of the former is independent of the promise of the latter; and the responsibilities which are imposed by the contract of guaranty differ from those which are created by the contract to which the guaranty is collateral."

■ In the new conditional sales contract covering the two scrapers entered into December 30, 1949, the consideration was in a larger amount than the balance due under the old contract and the payments were different in amount and were not to begin until June 15, 1950. The new second conditional sales contract entered into on January 5, 1950, covered the third scraper. The amount was the same as in the original contract, but payments were in different amounts and were not to begin until June 1, 1950. If an action had been brought by Ashbach against Calihan and Drews on their guaranty when Clark first defaulted on the two new contracts, he would have failed. The general rule is that a valid agreement between the principal debtor and creditor by which the time of payment or performance of the principal obligation is extended without the consent of the guarantor releases and discharges the guarantor from liability on the contract of guaranty. 24 Am. Jur., Guaranty, § 90.

In Schmidt v. McKenzie, 215 Minn. 1, 9 N. W. (2d) 1, modifications were made in an original contract providing for a change in the mode of payment for merchandise. The guarantor in the original contract did not consent to the change. In holding that the guarantor was released, we said (215 Minn. 7, 9, 9 N. W. [2d] 4, 5):

"* * * His [guarantor's] liability arose as and when he became a guarantor, and then only to the extent and within the limits specified in his guaranty. * * *

* * * * *

"In other words, defendant had the right to 'insist that he is bound to the extent, in manner, and under the circumstances pointed out in his obligation, and no further.' Simonson v. Grant, 36 Minn. 439, 442, 31 N. W. 861, 862."

Calihan and Drews are being asked to guarantee the performance of an entirely different contract from the one originally made by the principal. They are total strangers to the new contracts, and if recovery had been sought on their guaranty for defaults in the new contracts, they would have been held to have been released.

■ Since Ashbach has been paid in full for the three graders, it is clear that the obligation of Calihan and Drews as guarantors has terminated. 24 Am. Jur., Guaranty, § 74. No action could be maintained against them on the guaranty. We then have a situation in which the primary contract between Clark and Ashbach has been fully executed, and, under the wording of the agency contract, Calihan and Drews were entitled to a commission on each grader when its price had been paid in full. We have also the situation in which the collateral guaranty contract signed by Calihan and Drews has been terminated by the substitution of new contracts. There is nothing left of either the primary obligation or the obligation of the guarantors. Despite all this, Ashbach claims that Calihan and Drews have forfeited their right to compensation because Clark failed to make his payments on time and Calihan and Drews failed to step in and make the payments. Calihan and Drews had performed every act required of them under the agency contract to entitle them to the commission, the only claim here being that they had defaulted on their guaranty by not making the Clark payments when he defaulted, and that, therefore, they have no claim to the commission.

When Ashbach wrote Calihan and Drews on December 14, 1950, insisting that Clark's payments be made current by January 1, 1951, and that if they were not he would be forced to look to Calihan and Drews for immediate payment of the unpaid balance, he was referring to the contracts made on December 30, 1949, and January 5, 1950. These were the only ones on which anything was due. These contracts replaced the contract of August 22, 1949, which was the only contract on which Calihan and Drews had guaranteed Clark's performance. They apparently knew nothing of the new contracts and had guaranteed no payments thereunder. How the letters of December 14, 1950, can have any controlling influence on the disposition of the case we are unable to see. The second letter contains a misstatement as to the terms of the agency contract. Neither letter is of aid to Ashbach.

The only time Ashbach could have done anything relative to the guaranty contract of Calihan and Drews was between the time

when Clark defaulted on the first contract and December 30, 1949, when the first new conditional sales contract was entered into. After that date, the original contract did not exist. Ashbach did nothing. Not only did he do nothing about the guaranty, but instead he entered into substitute contracts. The only time Calihan and Drews could have done anything to forfeit their commission was during that same period. There was nothing they did or failed to do which would have forfeited the commission. We are unable to find a theory upon which the claim of Calihan and Drews or their assignee Clark can be defeated.

Order reversed with directions to enter judgment for plaintiff.

