## MELBOURNE DAHMES AND ANOTHER v. INDUSTRIAL CREDIT COMPANY.

110 N. W. (2d) 484.

September 8, 1961—No. 37,879.

*Jerome B. Simon* and *Bundlie, Kelley & Torrison,* for appellant.

*Brill & Brill,* for respondents.

*Dorsey, Owen, Barber, Marquart & Windhorst,* for First National Bank of Minneapolis; *Faegre & Benson,* for Northwestern National Bank of Minneapolis; *Doherty, Rumble & Butler,* for Northwestern National Bank of St. Paul; *Robert I. Lang,* for Minnesota Bankers Association; *Clarence O. Holten* and *James S. Eriksson,* for James Talcott, Inc., Minneapolis Securities Corporation, The Republic Acceptance Corporation, and the National Commercial Finance Conference, Inc., amici curiae.

UPON REARGUMENT.

DELL, CHIEF JUSTICE.

This is an action to have two promissory notes executed by the plaintiffs and two real estate mortgages securing said notes adjudged null and void. Defendant filed a counterclaim to recover under an alleged guaranty.

In March 1955 the plaintiffs organized a corporation known as Northwest Recapping, Inc., for the purpose of engaging in the business of recapping automobile and truck tires. On March 25, 1955, the plaintiff Melbourne Dahmes was issued 100 shares of the corporation's stock for which he paid $1,000. No other stock was issued. Subsequently Dahmes loaned personal funds to the corporation totaling $36,297.84,

receiving the corporation's notes for part of this amount. At all pertinent times Dahmes was president of the corporation and his wife, Leona J. Dahmes, was the secretary-treasurer.

On May 28, 1956, Northwest Recapping, Inc., (hereinafter referred to as the corporation) and the defendant entered into an Accounts Receivable Financing Agreement under which instrument defendant agreed to make loans to said corporation from time to time, secured by an assignment of the corporation's accounts receivable. As further security for said loans the corporation, on the same day, executed a chattel mortgage to the defendant on all of its tools and equipment. At the same time plaintiffs individually executed an instrument designated as a "GUARANTY," which provided in part:

"In order to induce INDUSTRIAL CREDIT COMPANY, a Minnesota corporation, to enter into financing agreements with and to make loans, secured by accounts receivable, to NORTHWEST RECAPPING, INC., a Minnesota corporation, and in consideration thereof and of other good and valuable considerations * * * the undersigned [plaintiffs] and each of them jointly and severally guarantee the due payment and performance by said NORTHWEST RECAPPING, INC., of all monies to be paid, and all things to be done, pursuant to each and every condition and covenant contained in said agreement, * * *.

"The undersigned hereby indemnifies the INDUSTRIAL CREDIT COMPANY, and agrees to hold it harmless against, all obligations, demand, losses, or liabilities, by whomsoever asserted, suffered, incurred or paid by INDUSTRIAL CREDIT COMPANY as a result of, or in any way arising out of, or following, or consequential to, transactions under the foregoing agreement.

"The undersigned * * * defer taking payment from NORTHWEST RECAPPING, INC., on its obligations to the undersigned without written approval from INDUSTRIAL CREDIT COMPANY."

In accordance with said instrument, defendant from time to time advanced money to the corporation equivalent to 80 percent of the latter's assigned accounts receivable. In each of such transactions the corporation executed a note to defendant for the sum advanced. Defend-

ant concedes that all of said notes provide for interest at a rate in excess of 8 percent per annum.[1]

On August 30, 1956, pursuant to L. 1947, c. 590, the corporation entered into a Factor's Lien Agreement with the defendant under which agreement the corporation gave the defendant a continuing lien upon all of its merchandise to secure loans made to it by the defendant.

On March 5, 1957, plaintiffs executed and delivered to the defendant the first of the two notes and mortgages here challenged. The note was for $4,000 and was secured by a mortgage on the plaintiffs' homestead. It contained the following provision:

"This promissory note is given as additional collateral security to secure to INDUSTRIAL CREDIT COMPANY the payment, when due, of all indebtedness or obligations of Northwest Recapping, Inc., a Minnesota corporation, presently owing or hereinafter incurred to INDUSTRIAL CREDIT COMPANY. The amount due under this note shall be the amount stated hereinbefore or the total unpaid indebtedness of the Northwest Recapping, Inc. to INDUSTRIAL CREDIT COMPANY whichever is less."

At that time the corporation was indebted to the defendant in the sum of $65,668.15. No money was advanced to plaintiffs on this note.

On August 19, 1957, plaintiffs executed and delivered to defendant the second of the notes and mortgages here involved. This note was in the sum of $35,000 and was likewise secured by mortgage on plaintiffs' homestead. It contained the same provision as did the March 5, 1957, note. At that time the corporation was indebted to the defendant in the sum of $84,210.55. Both of the mortgages described were subject to a first mortgage in favor of Northwestern Federal Savings & Loan Association.

On September 9, 1957, a new Accounts Receivable Financing Agreement was entered into between the corporation and the defendant. Under this agreement the corporation agreed to assign to the defendant all of its accounts receivable, present and future, as security

---

[1]The trial court found that defendant had collected interest on its loans to the corporation of approximately 20 percent per annum.

for loans to be made to it by the defendant. On the same day a separate instrument was executed by the plaintiffs designated "GUARANTY," which contained the following provisions:

"In order to induce Industrial Credit Company, a Minnesota corporation hereinafter called LENDER, to enter into financing agreements with, and to make loans to NORTHWEST RECAPPING, INC. * * * hereinafter called BORROWER, and in consideration thereof * * * the undersigned * * * guarantee the due payment and performance by BORROWER of all moneys to be paid, and all things to be done, pursuant to each and every condition and covenant contained in any such agreements, * * *.

"The undersigned hereby indemnifies Industrial Credit Company and agrees to hold it harmless against all obligations, demands, losses or liabilities * * * incurred or paid by Industrial Credit Company * * * arising out of or following or consequential to the making of any loans to BORROWER and the taking of security therefor.

"The undersigned agree: * * * that their liability hereunder is *direct and unconditional* and may be enforced *without requiring* LENDER *first to resort to any other right, remedy or security*; * * *.

"The undersigned waive: notice of the making of loans, the creation of indebtedness or of default and all other notices to which they might be entitled." (Italics supplied.)

On the date of this agreement the corporation was indebted to the defendant in the sum of $104,838.50.

Subsequent to the agreement of September 9, 1957, the defendant continued to make loans to the corporation and the corporation continued to make payments upon its past indebtedness and also on the new loans. Such payments exceeded the sum of $104,838.50 due on September 9, 1957, so that the indebtedness remaining unpaid, for which the foreclosure proceedings on the two mortgages were later instituted, presumably was incurred after the September 9, 1957, agreement. As the defendant made its various loans to the corporation the corporation on each occasion executed its notes therefor and assigned its accounts receivable to secure the notes. All of the notes provided for interest in excess of 8 percent per annum.

On March 4, 1958, the defendant instituted proceedings to foreclose its factor's lien. At that time there was a remainder due the defendant of $82,757.73. On April 9, 1958, it foreclosed the chattel mortgage and, after the foreclosure sale, there was a remainder owing of $88,510.74. On June 25, 1958, it foreclosed the two real estate mortgages on plaintiffs' homestead. After applying $19,380.32, the net amount received by it under said foreclosure proceedings, to the corporation's indebtedness, there remained due and owing the defendant the sum of $20,102.11, which sum was included in the counterclaim interposed against the plaintiffs.

The trial court adjudged the notes, mortgages, and foreclosure proceedings commenced thereon to be null and void, and ordered cancellation of the notes and mortgages. It further denied recovery on defendant's counterclaim for the remainder owing of $20,102.11 and on defendant's claim for advances made by it upon the first mortgage on said premises. The reason for the trial court's decision was: (1) The indebtedness for which the notes were given was usurious; (2) the notes were given without consideration; and (3) the note and mortgage dated August 19, 1957, were procured through the fraud of the defendant. Defendant appeals from the order denying its motion for a new trial.

■ It is conceded that the indebtedness of the corporation to the defendant provided for interest at a rate in excess of that permitted by statute.[2] However, under Minn. St. 334.021 a corporation cannot interpose the defense of usury in any action. It is also well settled that this same prohibition applies to individual guarantors of corporate obligations since, as a general rule, the obligation of the guarantor is measured by the obligation of the principal.[3] The rationale of the rule is that if an excessive interest rate does not render the principal obligation illegal, it should likewise not affect the undertaking of the guar-

---

[2]Minn. St. 334.01 provides: "* * * no person shall directly or indirectly take or receive in money, * * * any greater sum, * * * for the loan * * * of money, goods, or things in action, than $8 on $100 for one year; * * *."

[3]Annotation, 63 A. L. R. (2d) 924, 950.

antor which is to assure performance of the principal obligation.[4] Plaintiffs, however, contend that they are not precluded from asserting the defense of usury because (a) the loans were actually made to them individually rather than to the corporation; and (b) in any event they were co-obligors with the corporation and primarily rather than secondarily liable.

(a) We can find no evidence to support the finding of the trial court that the loans involved were in truth and in fact loans to the plaintiffs rather than to the corporation. The corporation was formed and in business for a substantial period of time prior to the time the loans were made. There is no showing that the proceeds of the loans went to the plaintiffs individually rather than to the corporation as working capital. To the contrary, the indebtedness of the corporation to the plaintiffs was subordinated to the claim of the defendant against the corporation. The very nature of the transaction, i. e., accounts receivable financing, indicates that the loans were genuine corporate obligations. The factual situation here is substantially different from that in cases where the corporation is specifically formed to act as a conduit for borrowed funds or is otherwise used for the obvious purpose of circumventing the usury laws.[5]

(b) The notes involved indicate on their face that they were given as collateral security to secure the obligations of the corporation to the defendant. This language falls squarely within the definition of a contract of guaranty as given in Schmidt v. McKenzie, 215 Minn. 1, 6, 9 N. W. (2d) 1, 3:

"* * * a collateral contract to answer for the payment of a debt or the performance of a duty in case of the default of another who is primarily liable to pay or perform the same."[6]

---

[4]See, Winkle v. Scott (8 Cir.) 99 F. (2d) 299; Tennant v. Joerns, 329 Ill. 34, 160 N. E. 160; Carozza v. Federal Finance & Credit Co. 149 Md. 223, 131 A. 332, 43 A. L. R. 1; Pardee v. Fetter, 345 Mich. 548, 77 N. W. (2d) 124; General Motors Acceptance Corp. v. Larson, 110 N. J. Eq. 305, 159 A. 819; General Phoenix Corp. v. Cabot, 300 N. Y. 87, 89 N. E. (2d) 238.

[5]See, Gelber v. Kugel's Tavern, Inc. 10 N. J. 191, 89 A. (2d) 654.

[6]See, also, Clark v. Otto B. Ashbach & Sons, Inc. 241 Minn. 267, 64 N. W. (2d) 517.

Plaintiffs, however, point out that by the terms of the September 9, 1957, agreement their liability was made "direct and unconditional" and enforceable without requiring the defendant "first to resort to any other right, remedy or security." They argue that because their undertaking was a primary and unconditional promise, the contract was not in fact one of "guaranty" despite the use of that term.

It is correct, as plaintiffs contend, that the nature of their liability should properly be gathered from the September 9, 1957, agreement since the loans which gave rise to the foreclosure proceedings here involved were made subsequent to that date. It is also true that the mere designation of a document as a "guaranty" does not conclusively establish it as such.[7] In our opinion, however, the quoted language of the agreement does not alter the plaintiffs' status as guarantors. A contract of guaranty may be either conditional or absolute.[8] If the guaranty is absolute, the obligor becomes liable merely upon the failure of performance by the debtor.[9] A conditional guarantor, on the other hand, is liable only upon the happening of the stated contingency, such as, for example, suit against the principal debtor, exhaustion of security, or the like.[10] In the absence of language clearly indicating that the guaranty is conditional, it is usually treated as absolute.[11]

The language of the September 9 agreement relied upon by the plaintiffs does nothing more than spell out the fact that the guaranty is absolute rather than conditional and is perfectly consistent with the defendant's contention that a guaranty was involved. There is no language in either the notes or the "guaranty" indicating that the plaintiffs' obligation was intended to be an original and separate undertaking made without reference to performance by a principal debtor. To the

[7] Merritt v. Haas, 113 Minn. 219, 129 N. W. 379.

[8] Holbert v. Wermerskirchen, 210 Minn. 119, 297 N. W. 327.

[9] For an example of an unconditional or absolute guaranty, see Northwestern Nat. Bank v. Foster, 196 Minn. 96, 264 N. W. 570.

[10] See, e. g., State Bank, by Benson, v. Lauterbach, 198 Minn. 98, 268 N. W. 918. The two types of guaranty are sometimes referred to as a guaranty of payment as distinguished from a guaranty of collection. See, 8 Dunnell, Dig. (3 ed.) §§ 4076, 4077.

[11] Holbert v. Wermerskirchen, 210 Minn. 119, 297 N. W. 327.

contrary, the September 9 agreement repeatedly refers to the principal corporate debtor, called the "BORROWER," and the liability of the plaintiffs is clearly predicated upon the failure of the "BORROWER" to perform. The notes, as we have pointed out, specifically make the plaintiffs' promise a collateral one.

The plaintiffs cite numerous authorities to the effect that the defense of usury is available to an individual who is the primary obligor but not to an individual who is secondarily liable on the corporate debt. The difficulty arises from the failure to ascribe appropriate definitions to the terms "primary" and "secondary." The plaintiffs here are secondarily liable in the sense that their liability is predicated on the failure of the principal obligor to perform. They are primarily liable in the sense that their guaranty was absolute rather than conditional. The rationale of the rule precluding guarantors from asserting the defense of usury, when it is not available to the principal debtor, relates to the character of the obligation rather than the means of enforcing it, and applies with equal force to both types of guarantees.[12] The true and correct issue and question involved is whether the plaintiffs' promise is an original undertaking or a collateral one. Although the defendant here could proceed directly against the plaintiffs, the plaintiffs' liability was, nevertheless, dependent upon the failure of the corporation to perform and hence was a collateral undertaking in which the defense of usury, not being available to the principal obligor, was similarly not available to the plaintiffs.

■ Since past indebtedness as well as future advances actually made are sufficient consideration for a mortgage,[13] the trial court's finding, that the notes and mortgages were given without consideration, is clearly wrong and cannot be sustained.

■ The trial court found that the note and mortgage executed on August 19, 1957, were fraudulently obtained from the plaintiffs by means of the following misrepresentations: That defendant would con-

---

[12]Winkle v. Scott (8 Cir.) 99 F. (2d) 299.

[13]Staples v. East St. Paul State Bank, 122 Minn. 419, 142 N. W. 721; Gaertner v. Western Elev. Co. 104 Minn. 467, 116 N. W. 945.

tinue to finance the business of the corporation until such time as its inventory could be liquidated in the normal course of business, and at normal wholesale prices; and that the defendant would not foreclose the chattel mortgage and factor's lien securities it held from the corporation but would continue to finance the business until the indebtedness due and to become due to the defendant was paid in full, with something left over for the corporation. It appears to us that the evidence factually is insufficient to support the findings. But we need not rely on that since, in our opinion, the alleged promises, even if made, do not constitute actionable fraud. The note on its face provides that it is payable on demand. The alleged promises would, in effect, create a situation in which the corporate indebtedness could never be satisfied by use of the note and real estate mortgage. Parol evidence is not admissible to contradict the express terms of a written agreement,[14] nor were the plaintiffs entitled to rely upon oral promises which were directly contradictory to the terms of the note.[15] As a matter of law plaintiffs' claim of fraud cannot be sustained.

The order is reversed with directions to dismiss plaintiffs' causes of action on the merits and to enter judgment in favor of the defendant and against the plaintiffs in the sum of $20,102.11 on its counterclaim, together with interest, costs, and disbursements, subject only to plaintiffs' right to be subrogated to the uncollected accounts receivable held by defendant as security.

The opinion in this case, written by another justice and formerly released on October 21, 1960, is withdrawn and this one issued and released in its place.

Reversed with directions.

THOMAS GALLAGHER, JUSTICE (dissenting).

■ I am of the opinion that the defense of usury, while not available to Industrial Credit Company,[1] is available to plaintiffs, whose liability

---

[14]Henvit v. Keller, 218 Minn. 299, 15 N. W. (2d) 780; McCreight v. Davey Tree Expert Co. 191 Minn. 489, 254 N. W. 623.

[15]Nelson v. Berkner, 139 Minn. 301, 166 N. W. 347.

[1]Minn. St. 334.021 provides in part: "No corporation shall hereafter interpose the defense of usury in any action."

for the corporate indebtedness was direct and primary rather than secondary. In states where, by statute, a plea of usury is not available to a corporation, it is well settled that an individual secondarily liable for the corporate debt likewise may not invoke the plea in litigation relative thereto.[2] The basis for the rule is that since the debt was valid when contracted by the corporation, it could not become invalidated by the subsequent creation of an individual's secondary liability for its payment.[3] The rule has been applied to endorsers, guarantors, and accommodation signers of corporate obligations[4] except where evidence of surrounding circumstances clearly indicated an intent that the liability should be primary.[5] Where the individual's liability for the corporate debt is direct and primary such as that of the comaker of a note or the co-obligor of an indebtedness or is direct and primary because the agreement creating the liability makes it so, the plea of usury may be invoked by the individual. In such cases,[6] the individual's liability arises by virtue of an undertaking or agreement in which he is in privity with the obligee so that if the debt involved is usurious it is invalid as to such individual at the time of its creation.[7] Thus as stated in Amity Finance Corp. v. Crock, 15 Ohio L. Abs. 243, 245:

"* * * The theory of the decisions is that the contract of the corporation to pay in excess of the lawful rate of interest is valid and the

---

[2]For compilation of cases on this, see Annotation, 63 A. L. R. (2d) 950.

[3]Amity Finance Corp. v. Crock, 15 Ohio L. Abs. 243.

[4]Winkle v. Scott (8 Cir.) 99 F. (2d) 299; Carozza v. Federal Finance & Credit Co. 149 Md. 223, 131 A. 332, 43 A. L. R. 1; Rockmore v. Epstein, 127 Misc. 526, 217 N. Y. S. 76; Salvin v. Myles Realty Co. 227 N.Y. 51, 124 N. E. 94, 6 A. L. R. 581; General Motors Acceptance Corp. v. Larson, 110 N. J. Eq. 305, 159 A. 819.

[5]Pink v. L. Kaplan, Inc. 252 App. Div. 490, 300 N. Y. S. 45; Schwartz v. Fifty Greenwich St. Realty Corp. 265 N. Y. 443, 193 N. E. 263.

[6]Pink v. L. Kaplan, Inc. 252 App. Div. 490, 300 N. Y. S. 45; Cabrera v. Olsen, 165 Misc. 374, 300 N. Y. S. 524; Schwartz v. Fifty Greenwich St. Realty Corp. 265 N. Y. 443, 193 N. E. 263; Astra Pictures, Inc. v. Schapiro, 182 Misc. 19, 48 N. Y. S. (2d) 858; Amity Finance Corp. v. Crock, 15 Ohio L. Abs. 243.

[7]Amity Finance Corp. v. Crock, 15 Ohio L. Abs. 243.

sureties are liable because assuring compliance with a valid contract. But in the instant case * * * [the comakers] were joint makers * * * of the note sued upon and were primarily liable. * * *

\* \* \* \* \*

"The obligation * * * was several as well as joint and * * * [the individual defendants] did not assume an obligation or contract of the * * * [corporation] but contracted a liability of their own.

"Upon an action to require the individuals to pay * * * the note, they are entitled to assert any defense which the law accords them * * *."

■ Here the nature of plaintiffs' liability must be gathered from the terms of their September 9, 1957, agreement with defendant. The corporate indebtedness which plaintiffs claim is usurious arose subsequent thereto. The challenged notes and the mortgages on their homestead by which such notes were secured served only as collateral security for such indebtedness. But by the terms of the September 9, 1957, agreement, such liability was made "direct and unconditional" and enforceable without requiring defendant "first to resort to any other right, remedy or security." Such provisions firmly establish that plaintiffs' liability to defendant for the corporate indebtedness was direct and primary and that the latter might look directly to plaintiffs for its payment without first resorting to any right or remedy it had against Northwest.

■ My conclusion as above is supported by numerous decisions construing agreements of a similar nature, both within and without the field of negotiable instruments.[8] The fact that such an agreement is designated a "guaranty" cannot alter the clear intent of the parties expressed therein that it was intended to and did impose a "direct and unconditional" and hence primary liability upon plaintiffs for Northwest's future indebtedness to defendant. Thus, it has been said that if an obligation appears to express a primary or unconditional promise the conclusion is that it is not a contract of guaranty;[9] that use of the term

---

[8]State ex rel. First Minneapolis Trust Co. v. Fosseen, 192 Minn. 108, 255 N. W. 816, 94 A. L. R. 1149; Merritt v. Haas, 113 Minn. 219, 129 N. W. 379.

[9]Merritt v. Haas, 113 Minn. 219, 129 N. W. 379; Yangtsze Rapid S. S.

"guaranty" is not conclusive—that nevertheless the writing may be shown not to import a collateral obligation;[10] that the word "guaranty" is frequently employed in business transactions to describe not the securing of a debt but an intention to be bound by a primary or individual obligation;[11] and that when the liability of a guarantor is expressed in unambiguous language, it cannot be limited by judicial construction.[12] In Dr. Ward's Medical Co. v. Kallio, 173 Minn. 462, 463, 217 N. W. 369, which involved construction of a guaranty, the court stated that it is—

"* * * necessary to look to the whole agreement for the intention of the parties and * * * not * * * to ignore or read out of it any language expressive of definite intent, * * *."

See, also, Marquette Trust Co. v. Doyle, 176 Minn. 529, 224 N. W. 149.

It would follow that under the authorities above cited the plea of usury was available to plaintiffs as primary co-obligors of Northwest's indebtedness to defendant which was incurred subsequent to September 9, 1957, and which is involved in these proceedings. Since it is conceded that such indebtedness required interest at a rate in excess of 8 percent per annum, it seems clear that the trial court correctly determined that it was usurious;[13] and that in consequence

Co. v. Deutsch-Asiatische Bank (9 Cir.) 59 F. (2d) 8; City of Aurora v. Krauss, 99 Colo. 12, 59 P. (2d) 79; Cobb v. Vaughan & Co. 141 Va. 100, 126 S. E. 77, 43 A. L. R. 177.

[10]Merritt v. Haas, 113 Minn. 219, 129 N. W. 379; Packer v. Benton, 35 Conn. 343, 95 Am. D. 246; Mahler Textiles, Inc. v. Woodka, 251 Ill. App. 177; Nading v. McGregor, 121 Ind. 465, 23 N. E. 283, 6 L. R. A. 686.

[11]Border Nat. Bank v. American Nat. Bank (5 Cir.) 282 F. 73, 78, certiorari denied, 260 U. S. 701, 43 S. Ct. 96, 67 L. ed. 471; Bridge v. Welda State Bank, 222 Mo. App. 586, 292 S. W. 1079.

[12]Clark v. Otto B. Ashbach & Sons, Inc. 241 Minn. 267, 64 N. W. (2d) 517; Dr. Ward's Medical Co. v. Kallio, 173 Minn. 462, 217 N. W. 369; Donlin v. Wamsley, 176 Minn. 234, 223 N. W. 98.

[13]Minn. St. 334.01 provides: "* * * no person shall directly or indirectly take or receive in money * * * any greater sum * * * for the loan * * * of money, goods, or things in action, than $8 on $100 for one year; * * *."

the collateral notes and mortgages given by plaintiffs to secure it as well as the foreclosure proceedings relative thereto were null and void.[14] By the same token, defendant's counterclaim for $20,102.11, the balance of such usurious indebtedness, was properly disallowed.

■ With reference to the $2,695.84 advanced by defendant to maintain the first mortgage and to preserve the homestead premises from its foreclosure; and to the $3,325.75 advanced by defendant to prevent loss of title through a mechanics lien foreclosure on the homestead premises, I feel that in equity and justice defendant is entitled to reimbursement therefor. These payments had nothing to do with the question of usury and, had they not been made, plaintiffs would have lost title to the real estate either through foreclosure of the first mortgage or expiration of the year of redemption in connection with the mechanics lien foreclosure. Thus, in Becker v. Olkon, 176 Minn. 427, 431, 223 N. W. 777, 778, where the mortgagee in two usurious mortgages had included in the indebtedness secured thereby the amount of two valid prior mortgages, which such mortgagee had owned and had then satisfied without payment otherwise, the court stated:

"* * * It is true that, this being a statutory action to cancel the notes and mortgages * * * if usury is found the whole instrument is vitiated. But on the facts alleged in the answer and as to which the trial revealed no controversy, defendant [mortgagee] is entitled to the equitable relief of having his valid liens reinstated * * * as between him and plaintiff, * * *."

There the court with approval quoted the syllabus from Patterson v. Birdsall, 64 N. Y. 294, 21 Am. R. 609 (176 Minn. 431, 223 N. W. 778):

"A valid and subsisting obligation is not destroyed because included in a security or made the subject of a contract void for usury; although

---

[14]Minn. St. 334.03 provides: "All * * * notes, mortgages, and all other contracts * * * or any other thing, whereupon or whereby there shall be reserved, secured, or taken any greater sum or value for the loan or forbearance of any money, goods, or things in action than hereinbefore prescribed, shall be void except as to bona fide purchasers of negotiable paper, * * *." See, 55 Am. Jur., Usury, § 90.

formally satisfied and discharged it may be revived and enforced in case the new security or contract is invalidated."

So here, based on such principles, it is my opinion that defendant should be reimbursed for the sums described, with legal interest thereon, and that the amount thereof should be adjudged a lien upon plaintiffs' premises covered by the mortgages found to be invalid, and subject to prior valid encumbrances thereon. See, 55 Am. Jur., Usury, § 95.

■ As the majority now construe Minn. St. 334.021 in conjunction with § 334.01, the aftermath can only be the end of statutory protection against usury for individual owners of small corporate business enterprises in Minnesota. Thereunder it is a certainty that in most cases only to such *corporate* enterprises will business loans be made. That such loans will bear interest in excess of 8 percent per annum is likewise quite certain. The process by which such higher rates can be safely attained will no longer be complex or hazardous under the decision here. When an individual business owner is compelled by economic conditions or otherwise to seek financing, it will be then revealed to him by prospective lenders that only corporate loans at excessive rates of interest are considered; that such loans must be secured by all corporate assets and, in addition, by pledge of such individual's assets otherwise exempt and protected against usury; and that direct and primary liability therefor must be assumed by the individual owner.

Quite often, as in the instant case, the inevitable result is the financial doom of both the corporation and the individual, preceded, of course, by a vain and valiant effort to pay off an extortionate debt, seldom resulting in more than payment of the excessive interest thereon.[15] A default therein, of course, is usually followed by prompt foreclosure of all corporate and individual assets and often, as here, by claims for deficiency judgments against the individual owner for any unpaid balance on the corporate debt after the various foreclosure sales.

---

[15] The trial court found that defendant had collected interest on its loans to the corporation of approximately 20 percent per annum.