Harold J. BAKER and Linda C.
Baker, Respondents,

v.

**CITIZENS STATE BANK OF ST. LOUIS
PARK, Appellant.**

No. C1–82–1548.

Supreme Court of Minnesota.

May 11, 1984.

Rehearing Denied July 20, 1984.

Norman R. Carpenter, Minneapolis, for appellant.

Richard A. Emerick, Bloomington, for respondents.

## OPINION

AMDAHL, Chief Justice.

Harold J. and Linda C. Baker brought a declaratory judgment action in Hennepin County District Court seeking to have a second mortgage held by Citizens State Bank of St. Louis Park (hereafter Citizens State Bank) on their farm property (Windcrest Farms) in Minnetrista declared invalid for lack of consideration, for failure to comply with the truth in lending laws, and for misrepresentation. Plaintiffs sought costs, disbursements, and attorney fees.

Citizens State Bank counterclaimed alleging default in the conditions of a loan guaranty agreement and mortgage. The bank demanded that the court direct a foreclosure sale of the farm property and that the proceeds be applied to the $358,217.37 claimed as the amount due under the mortgage.

The trial court held that the second mortgage on the farm property was invalid due to failure of consideration. Plaintiffs were awarded costs and disbursements.

The bank appeals from the lower court judgment. Because we agree that the second mortgage and the underlying loan guarantee agreement are void for failure

of consideration, we affirm the lower court judgment.

Hal Baker Co., was a Minnesota corporation founded in 1973 and engaged in the supply and installation of commercial sheet metal roofs. Harold Baker was the president of Hal Baker Co. and also the president and sole shareholder of the Hal Baker Holding Co. which owned Hal Baker Co. Hal Baker Co. had been a customer of Citizens State Bank in good standing since June 1977 and the bank had extended a line of credit for working capital to the company in exchange for a series of promissory notes. An audit of Hal Baker Co. for the year ending February 29, 1980, indicated total assets of $1,304,220 over a total debt of $1,148,176 for a tangible net worth of $156,044. The trial court found that as of July 8, 1980, the bank placed its collateral position on a 2 to 1 basis with the Baker Co.'s outstanding loans and that through the fall of 1980 all loan payments were current.

As of December 1, 1980, the total amount owed by the Hal Baker Co. to the Citizens State Bank equaled $443,995.74 composed of three separate loans which were collateralized by a tanker truck, accounts receivable, inventory, and equipment.

The bank admits that none of the outstanding term loans was in default as of December 1, 1980, and that no demand had been made on the $150,000 loan. Additionally, on December 4, 1979, Baker had, personally and on behalf of three other companies in which he had an interest, extended a guarantee for $450,000.

On December 1, 1980, the bank came under new ownership and management. A chronological description of the events of the ensuing 2 weeks is necessary to an understanding of the dispositive facts in this case.

The outgoing president had been primarily responsible for the Hal Baker Co. account and had expressed concern about a mounting cash flow problem due to difficulty in collecting accounts receivable.

On December 3, 1980, in a meeting of the bank's management, Patrick Wells, who had assumed responsibility for the Hal Baker Co. account, expressed his belief that the company was literally bankrupt. Wells' opinion was based on the following:

1. Despite Baker's indication at the time the $150,000 loan was advanced that he would probably be able to repay a substantial portion by September 25, 1980, no payments had been made.

2. Numerous overdrafts had occurred in the Hal Baker Co. checking account from September through November 1980, the highest total of which reached $2,900.

3. Baker was having great difficulty collecting several large accounts receivable, totaling $450,000, because Baker's major materials supplier, Owens-Corning Fiberglass Corporation, which claimed an unpaid debt of $500,000, had contacted those debtors and was threatening to file mechanics lien claims on Hal Baker Co. construction projects. The credit manager of Owens-Corning had contacted Bernhard Loewen, the senior vice president of the bank, that same day about the debt. Baker contended that the debt was just over $300,000.

4. Hal Baker Co. had made a personal loan of $82,499 to Baker. The loan had appeared on the company's year end financial statement as an asset but had not been repaid and so further reduced the available net worth of the company.

At the December 3 meeting, the bank officers discussed the need for additional collateral, and the possibility of setting up a collateral account, and Wells was instructed to investigate the status of the accounts receivable. The bank officers decided that if liquidity could be restored then payment of the notes could be on an installment basis but if not, the notes would be called immediately.

On the same day, Wells met with Baker and had him sign a new security agreement

for Hal Baker Co., pledging as collateral all accounts receivable, inventory, and equipment, but with the total dollar value pledged left blank.

Also on December 3, the bank honored a check for $21,695.53 made payable to Polyfoam, Inc., a supplier of Hal Baker Co. despite an existing November 25 stop payment order on that check from Baker and despite the fact that the same check had, on or about November 25, 1980, been dishonored by the bank because of insufficient funds. The bank officers claim the check was honored due to negligence or mistake. Baker claims the Polyfoam check was deliberately honored in order to create an "overdraft" and provide an opportunity to demand additional collateral.

On December 4 and 5, Wells attempted to collect all Hal Baker Co. outstanding receivables but was unsuccessful.

The bank claims that their decision to ask for additional security was not made until December 8, but on December 4 or 5, Loewen asked Harriet Richter, the bank's officer in charge of real estate transactions, to prepare the following documents, dated for execution on December 8:

(1) A promissory note due on demand to cover the overdraft of $21,695.53 created by the honoring of the Polyfoam check.

(2) A loan guarantee agreement to be signed by Harold J. Baker and Linda C. Baker for $518,698.53 secured by a second mortgage on the Bakers' homestead in Wayzata and a second mortgage on the Minnetrista farm.[1]

(3) A second mortgage agreement for $518,698.53 to be signed by the Bakers conveying both the homestead and the farm property.[2]

(4) A truth in lending statement for the signatures of Hal J. Baker and Linda C. Baker.

On December 8, 1980, Baker met with Wells and Loewen who threatened to call the outstanding notes of the Hal Baker Co. unless he signed all the above documents even though all concerned knew that Hal Baker Co. would have been unable to pay the notes in full at that time.

Baker signed all the above agreements, but the Wayzata homestead was owned by him and his wife in joint tenancy and his wife refused to sign the mortgage agreements. Repeatedly, over the next 8 days, Baker was told he must return the executed mortgages or the bank would call the notes.

On December 9, 1980, a check from Twin City Construction Co. jointly payable to Hal Baker Co. and Owens-Corning Fiberglass in the amount of $117,316.20 was returned by the Federal Reserve Bank for lack of endorsement by Owens-Corning and was charged against the Hal Baker Co. account creating an overdraft. At a December 11 meeting with the bank officers, Baker was asked to sign a promissory note for $117,316.20 to cover the overdraft and a new personal guarantee agreement in the amount of $900,000. On the advice of his attorney, Baker did not sign these documents. He did, however, propose shrinking the Hal Baker Co. to a more manageable size, a proposal to which the bank reacted favorably.

The bank argued on appeal that demand was made on payment of the outstanding obligation on December 11, 1980. We find it inconceivable that, if that were true, Baker would later agree, as he did, to a second mortgage on his farm. In fact, the bank president admitted at trial that the second mortgage was executed on December 16 in

---

**1.** The total outstanding debt at that time was $465,691.27 including the Polyfoam check and the tanker truck installment loan which had a balance due of $15,289.18. Mr. Baker's personal guarantee which he argues was not meant to cover the tanker loan was for $450,000. But Loewen testified it was bank practice to use the principal sums of the loan rather than the

amount still owing in calculating outstanding debts, hence the $518,698.53 loan guarantee.

**2.** As of December 1, 1980, the bank also held a first mortgage on the Minnetrista farm to secure a loan of $180,727.96 made February 27, 1980, to the Bakers personally to purchase the farm.

consideration of a nonwritten agreement to forego the various rights of the Citizens State Bank so long as Baker did everything he could to pay his debts to the bank and to reduce the size of his business. Nonetheless he still insisted the notes had already been called. Loewen also admitted at trial, when speaking of the demand letters Baker later signed, that the demands *may* have been delivered on the 23rd. The trial court's finding that demand was not made until December 23, 1980, is substantially supported by the evidence.

On December 12, Linda Baker met with Wells and Loewen and again refused to sign the second mortgage on their Wayzata homestead and the other three documents despite threats by the bank officers to the effect that if she didn't sign the bank would call the loans and put her husband out of business.

On December 13, officers and accountants for the bank examined in-house documents at the premises of the Hal Baker Co. and found the status of the accounts and receivables to be as Hal Baker had represented.

On December 16, at a meeting with Wells and the bank president, Baker signed the note for $117,316.20 and executed the second mortgage on the farm property which was registered only in his name. There is sufficient evidence that the bank officers agreed that the Hal Baker Co. notes would not be called and a scaled down version of the corporation would be allowed to continue in business.

On that same day, December 16, the bank set up a collateral account and made the first transfer of Hal Baker Co. funds into the collateral account.

The second mortgage was recorded on December 17. On December 18, Baker testified, and the trial court found, he was called in to the bank and asked to sign copies of demand letters but was told by Loewen that the letters were a mere for-mality and the notes were not actually being called. On December 23, the Hal Baker Co. notes were called.

Baker was never informed by the bank that its position was that it didn't have to exhaust its other collateral in Hal Baker Co. before foreclosing on the farm.

From December 16, 1980, through February of 1981, when the collateral account was closed and all remaining monies transferred as payment on the notes, the Citizens State Bank controlled all business activity of Hal Baker Co. The bank decided which suppliers, wages, and salaries would be paid and refused to pay union benefits, the Internal Revenue Service, the State Department of Revenue, and Baker's own salary. Some payroll and suppliers' checks bounced during this period. The bank secured the company's interest in the partnership which owned the company building and warehouse and instituted, but later terminated, suits in its own name against some of the larger outstanding receivables.

The bank held an auction of Hal Baker Co. equipment on January 31, 1981. Approximately $118,000 was received for equipment that had been valued at approximately $499,715 in the 1980 audit. This amount was applied toward the bank debt.

An involuntary bankruptcy petition was filed by the union health and welfare benefit funds and the state and federal agencies that the bank had refused to pay. Eventually Hal Baker Co. was declared bankrupt.

There is evidence that the bank eventually realized sufficient funds to offset the Baker Co. debts, even prior to collecting on the outstanding receivables. Of course, the bank's fear, at the time the second mortgage was signed, was that the security interests in the accounts receivable could not be realized at least without extensive litigation, and that there were insufficient other funds upon which to draw.[3] Hence,

---

**3.** We note that the record shows the history of the Hal Baker Co.'s ability to pay back loans was a good one. Disputes and litigation with regard to supplier's debts had been common in the past but the debts had always been paid. Baker had also stopped payment on checks many times when it was necessary. A bank officer admitted these were not uncommon situ-

the bank wished to have tangible property as security. We are faced with the question of whether the second mortgage obtained by the Citizens State Bank is, nevertheless, void for failure of consideration.

■ Appellant argues strenuously that a mortgage is a conveyance that does not require consideration and that therefore the trial judge's conclusion that the second mortgage is invalid is in error. Appellant insists it is not engaging in an exercise in semantics, but that is exactly what it has done. Courts often use the word "mortgage" to refer to the underlying debt. *See, e.g., Turpin v. Hayek,* 219 Minn. 587, 587, 18 N.W.2d 592, 592 (1945) ("A consideration is essential to the validity of a mortgage"). Technically it is true that a mortgage does not require consideration but the legal result is still the same; unless a deed is intended to convey property by gift, *see Lidstrom v. Mundahl,* 310 Minn. 1, 246 N.W.2d 16 (1976), and such is obviously not the case here, a mortgage is a conditional deed conveying property as security for indebtedness. The condition of the mortgage is payment of the underlying debt which generally involves a contract for which consideration is required. The validity of the mortgage therefore depends indirectly upon consideration. IV *American Law of Property,* § 16.67, at 126–27 (1952). The general proposition is that "to the same extent that the secured obligation is invalid or subject to a defense so too is the mortgage securing it * * *. The rights and remedies of the parties * * * as to the obligation will determine those as to the mortgage." *Id.,* § 16.69, at 130. The same author comments that "[t]he dependence of the mortgage upon the debt as an accessory to it is strikingly illustrated in cases where the obligation is affected by illegality, usury, fraud, mistake, duress, and *failure of consideration." Id.,* at 129–30 (Emphasis added). For the second mortgage on the farm to be valid, there must have been some consideration for the underlying debt.

As support for its contention that Baker's preexisting debt constituted sufficient consideration for the underlying debt, the bank cites *Gaertner v. Western Elevator Co.,* 104 Minn. 467, 116 N.W. 945 (1908), and *Dahmes v. Industrial Credit Company,* 261 Minn. 26, 110 N.W.2d 484 (1961). But both cases involved future advances as consideration in addition to the preexisting debt. In *Dahmes,* the court specified that the future advances, to be sufficient, had to be "actually made." *Id.,* at 34, 110 N.W.2d at 489. There are no other cases in Minnesota in which preexisting debt alone constituted sufficient consideration for a mortgage in real property. Even the jurisdictions which have so held, *see Lehrenkrauss v. Bonnell,* 199 N.Y. 240, 92 N.E. 637 (1910), and *In re Lowell,* 20 B.R. 464 (Bkrtcy.D.Mass.1982), have made a distinction when the mortgagor is a third-party guarantor. "If the guaranty agreement was entered into, not as part of a transaction which included the creation of the original or principal debt or obligation, but independent thereof, the guarantor's promise must have been supported by a consideration which was distinct from that of the principal debt. A consideration is not found in a mere naked promise to pay the existing debt of another." 38 Am.Jur.2d *Guaranty* § 45 at 1047–48 (1968) (footnote omitted).

■ We agree that a preexisting debt is not sufficient consideration for a third-party guarantee. Harold Baker was acting in his personal capacity as a guarantor of the liability of the Hal Baker Co. when he signed the second mortgage. A guarantee is an undertaking or promise to pay on the part of one person that is collateral to a primary obligation and that binds the guarantor to performance in the case of the default of the one primarily bound. *Clark v. Otto B. Ashbach & Sons, Inc.,* 241 Minn. 267, 64 N.W.2d 517 (1954). *Accord Twin City Co-op Credit Union v. Bartlett,* 266 Minn. 366, 123 N.W.2d 675 (1963). It is axiomatic that when a director or shareholder extends his or her personal obliga-

ations in the contractor business and did not

reflect badly on the customer.

tion to cover a corporate debt, a guarantee contract is created. *See First National Bank of Hopkins v. International Machines Corp.*, 279 Minn. 188, 156 N.W.2d 86 (1968). The second mortgage must therefore fail for lack of consideration unless some other form of consideration was advanced.

In the instant case, the mortgage and the loan guaranty agreement recite the consideration to be the preexisting debt of $518,-698.53. Nevertheless, both parties presented parol evidence to show that the preexisting debt was not the sole consideration.

■■■ The general rule is that parol evidence is not admissible to contradict the express terms of a written agreement. *Dahmes*, 261 Minn. at 35, 110 N.W.2d at 490. But the court, in *Dahmes*, did consider parol evidence and concluded that the factual evidence was insufficient to support a finding that the defendant had promised not to foreclose the chattel mortgage and corporate securities and to continue to finance the business until the indebtedness came due. *Id.* The rule elsewhere is that a party to a written contract may show that the consideration is different from that recited in the writing but only insofar as the writing is subject to modification or explanation and not to allow a party to show the agreement was other than what is set forth in the writing. *Clark v. Henderson*, 62 N.D. 503, 244 N.W. 314 (1931). Additionally, parol evidence is admissible "when the written agreement is incomplete or ambiguous * * *." *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn.1978). Since we hold that the consideration recited in the loan guarantee and mortgage at issue is insufficient, parol evidence is admissible to show the existence of other bargained-for consideration. There was considerable evidence in this case that the bank promised to forebear from calling the outstanding debts of the Hal Baker Co. if Baker would sign a second mortgage on his farm.

■■■ A promise of guaranty may be made in consideration of a requested act or a requested promise of action or of forebearance. There is considerable authority to the effect that a promise to forebear from exercising a legal right of the creditor's equals sufficient consideration to make any return promise of guaranty enforceable, provided "the promise is coupled with actual forbearance." 38 Am.Jur.2d *Guaranty* § 46, at 1049 (1968) (footnote omitted).

■■■ There are four Minnesota cases on point. The trial court relied on *McDonald Bros. Co. v. Koltes*, 155 Minn. 24, 192 N.W. 109 (1923), a case in which there "was no evidence of an express promise by plaintiff to refrain from enforcing its claim against the company or to extend the time of payment." *Id.* at 27, 192 N.W. at 110. However, the court found there was sufficient consideration to support the promise of a third person to pay the demand if it could be inferred from the circumstances that "there was an implied request for forebearance for a time, and that such forbearance was in fact extended in compliance with the request. The question is always one of fact, and the inference may be drawn from circumstantial as well as from direct evidence." *Id.* at 28, 192 N.W. at 110. In *Merchants State Bank v. Sunset Orchard Land Co.*, 158 Minn. 108, 196 N.W. 963 (1924), a preexisting debt was sufficient consideration for a guarantee because the note by its terms extended the time of payment for a period of a year. The more recent case of *Charles v. Hill*, 260 N.W.2d 571 (Minn.1977), found forbearance even of a doubtful claim to constitute valid consideration.

Appellant cites *O'Neil v. Dux*, 257 Minn. 383, 101 N.W.2d 588 (1960), which states that "it is well recognized that a preexisting debt is ample consideration for a note." *Id.* at 390, 101 N.W.2d at 594 (citations omitted). However, that case dealt with a creditor who had waived a present right of action and agreed to accept monthly installments on a note that was past due. Moreover, in the next paragraph the court firmly states that "the extension of time is a sufficient consideration to support a guaranty of payment made by third parties * * *," *Id.*, 101 N.W.2d at 594, thus

implying that the preexisting debt alone would not have equaled sufficient consideration for a guaranty agreement.

Other jurisdictions recognize the same principle. In *Merchants Discount Corp. v. Federal Street Corp.*, 300 Mass. 167, 14 N.E.2d 155 (1938), the lender's implied agreement to postpone liquidation of the collateral and collection of the loan was sufficient consideration for the guarantee of a loan made by one corporation to another and executed by controlling shareholders. Similarly, a contract of guaranty of a corporate debt, executed by the corporation's majority stockholders, was supported by consideration where the creditor dismissed a pending lawsuit. *Estes v. Oilfield Salvage Co., Inc.*, 284 S.W.2d 201 (Tex.Civ.App.1955). In the instant case there was sufficient evidence to support the inference that forebearance was the bargained-for consideration for the mortgage guarantee.

 If a definite time for forebearance has not been specified, a reasonable time is implied. *United and Globe Rubber Mfg. Co. v. Conard*, 80 N.J.L. 286, 78 A. 203 (1910). If the creditor does not forebear for a reasonable time, there is a failure of consideration and the guarantor is discharged from liability. *The Franklin National Bank of Long Island v. Palm Beach Builders, Inc.*, 28 Misc.2d 986, 221 N.Y.S.2d 133 (1961).

 The trial judge found that "forebearance from calling these notes for either two or five days is clearly an unreasonably short length of time." There are no cases in Minnesota addressing what is a reasonable time in the case of a bank's forebearance from calling a debt. But in *Sheraton Service Corp. v. Kanavos*, 4 Mass.App. 851, 357 N.E.2d 20 (1976), 6 months was regarded as reasonable and in *Matter of Slodov*, 419 F.Supp. 64 (N.D. Ohio 1976), a timespan from late February to late summer of the same year was also held to be reasonable. It is clear, however, that the 7 days between the 16th and the 23rd was unreasonable. The purpose of bargaining for forebearance is to attempt

to find a means to pay the outstanding debts. In this case, there was proof that the bank agreed to allow Baker time to reorganize his corporation and reduce it to a manageable size. This obviously could not be accomplished in 7 days. We hold that the second mortgage on the Bakers' Minnetrista farm is void for failure of consideration.

Affirmed.