GENERAL MOTORS ACCEPTANCE CORPORATION, complainant,

*v.*

THOMAS J. LARSON et al., defendants.

[Decided March 30th, 1932.]

306

*Messrs. McDermott, Enright & Carpenter,* for the complainant.

*Mr. Stephen P. Piga,* for J. P. Eagan, receiver Larson-Moore Refrigerating Company.

*Mr. Maurice C. Brigadier,* for the S. C. Construction Company.

*Mr. Mark A. Sullivan,* for A. O. Meding.

BIGELOW, V. C.

I will first take up the mortgages. Meding, the mortgageè named, claims no interest in them. He readily admits that he was a trustee for the refrigerating company. Now, as to the title of the acceptance corporation.

When the refrigerating company, by fraud, obtained from the acceptance corporation first $24,714.07 and then $9,456, it became, by operation of law, a trustee for these moneys; the beneficial title remained in the acceptance corporation. *Ashby* v. *Yetter, 79 N. J. Eq. 196.* The rule that the *ceslui que trust* may follow the trust property in whatever form it assumes is too well settled to require citation of authorities. The burden, however, is on the claimant to prove with reasonable certainty that the trust fund was invested in the property upon which he seeks to fasten his equitable title. In the present case, the moneys of the acceptance corporation were deposited in the bank account of the refrigerating company and there mingled with other funds and checks were drawn from time to time against this account. It is presumed in such case that the trustee draws from the account first his own funds and leaves in the account the money which is not his own. *Smith* v. *Combs, 49 N. J. Eq. 420; Standish* v. *Babcock, 52 N. J. Eq. 628; reversed, 53 N. J. Eq. 376; Ellicott* v. *Kuhl, 60 N. J. Eq. 333.* The presumption may be applied to the facts evidenced by a transcript of the refrigerating company's bank account: The acceptance corporation's check for $24,714.07 was credited to the account on November 6th. Thereafter, there were sundry withdrawals which on November 13th brought the account down to $7,895.11; this balance belonged in equity to the acceptance corporation. The following day that company's check for $9,456 was credited, making $17,351 of that company in the account. The account was reduced to $12,543.33

on November 19th; that was the amount of the acceptance corporation's funds still in the account when, on the following day, Tucker's check for $13,000 was charged. This left a balance of $2,394.51 (there being a deposit of other funds the same day) which presumably belonged to the acceptance corporation. Hence, of the amount paid to Tucker $10,148.82 ($12,543.33—$2,394.51) was the money of the acceptance corporation and measures its interest in the mortgages. The balance of the mortgage money belonged to the refrigerating company but (as will be seen) that has been paid by the construction company, so that the only party now interested in the mortgages is the acceptance corporation.

The mortgagors and the receiver contend that the acceptance corporation, by executing a certain agreement March 9th, 1931, elected to treat the refrigerating company as a debtor and not as a trustee and therefore cannot now assert a title to the mortgages. When Larson disappeared, complainant started an investigation of the contracts it had purchased from the refrigerating company and by March 9th, 1931, it had an excellent idea of the true situation. On that day, the acceptance corporation and two other creditors entered into an agreement with the refrigerating company, and one of its officers, Moore, the general purpose of which was to enable the refrigerating company to continue in business so that it might be able to pay its creditors. Moore agreed to loan to the company within thirty days at least $10,000 and he did so. The refrigerating company agreed to pay the creditors quarterly out of the proceeds of the business and not to pay any dividends or make any unusual expenditures. The acceptance corporation and the other creditors agreed "so long as these presents shall remain in full force and effect, not to sue, attach or molest the company for or on account of their indebtedness herein set forth and that these presents may be pleaded as a defense by the company in any action or proceeding which may be brought, instituted or taken by or on behalf of any of the said creditors against the company." The indebtedness to complainant arising out of the construction company contracts and the Matter con-

tract was set forth in the agreement. I think the acceptance corporation is not prejudiced by this agreement.

· A person defrauded can sue the wrong-doer and, at the same time, pursue the property of which he has been defrauded. *Singer Manufacturing Co.* v. *Stillman, 52 N. J. Law 263; Francis* v. *Francis, 5 DeG. M. & G. 108; 43 Eng. Rep. 811.* If he can trace and recover part only of his property, he can hold the defendant personally liable for the balance due him. Of course, he cannot be twice paid, once by the recapture of his property and once by payment out of general estate of the trustee. The acceptance corporation has been paid nothing; it has brought no suit except the present one; it has merely recognized the refrigerating company as a debtor, and it is not barred by any election from establishing its title to the mortgages. Nor does such relief prevent complainant from obtaining in the present suit another remedy which it seeks, namely, a personal money decree against some of the defendants. Those who defrauded complainant are, in equity, indebted to complainant for the amount so obtained; the mortgages are a security for a part of that sum. There is no inconsistency in decreeing the payment of the amount due by those liable, and at the same time giving complainant the benefit of the security.

The two mortgages are conditioned to the payment of $13,000 each or a total of $26,000. They were intended, however, only to secure the debt of the construction company to the refrigerating company created at the time the mortgages were made and by that debt the amount due on the mortgages is measured. The amount loaned to the construction company in this transaction was $10,000—the $13,000 check given by the refrigerating company to Tucker, minus $3,000 paid to the refrigerating company by the construction company at the same time. But the construction company agreed to pay the refrigerating company a bonus of $1,000 in addition to the amount loaned. This agreement, since the borrower was a corporation, was not contrary to the policy of this state and it can be enforced in this court. The debt secured by the mortgages was $11,000. The mortgagors are

individuals, not corporations, and if they had been the principal debtors and had agreed to pay a bonus of $1,000, they could have pleaded usury and even in the absence of such a plea, their property would only have been liable in this court for the amount loaned. *Powers* v. *Chaplain, 30 N. J. Eq. 17; Runkle* v. *Smith, 89 N. J. Eq. 103.* But they were not the principal debtors and the fact that they pledged their property for the debt of the construction company does not make the transaction usurious. *Commercial Funding Corp.* v. *Melroy Construction Co., 106 N. J. Eq. 11; Liebers* v. *Plainfield Spanish Homes Building Co., 108 N. J. Eq. 391; Rosa* v. *Butterfield, 33 N. Y. 665.*

About a month after the mortgages were executed, the construction company paid to the refrigerating company $1,000 on account of the debt secured by the mortgages. This payment was made while the construction company, through its president, had notice of enough of the facts which made the refrigerating company a constructive trustee, to put the construction company on its guard. Because of this notice, the construction company is deemed to have known that the acceptance corporation owned the mortgages or a large interest therein, and that the refrigerating company had been guilty of fraud in the premises. The construction company acted at its own risk, when it dealt with the refrigerating company as the owner of the mortgages. The latter company did not pay over to the acceptance corporation on account of this particular transaction the amount received by it from the construction company and therefore the construction company can have no benefit from this payment as against the acceptance corporation. The payment was, however, good as against the refrigerating company and its receiver.

The act of Meding in causing the mortgages to be canceled of record did not affect the rights of the parties. The mortgages were not, in fact, paid; Meding had a bare legal title; his action was not authorized or ratified by the beneficial owners of the mortgages and was a constructive fraud against them. "When the cancellation of a mortgage is procured by

fraud or made by mistake, or without authority, and without actual payment and satisfaction, the cancellation will be set aside and the mortgage enforced." *Dudley* v. *Bergen, 23 N. J. Eq. 397.*

The bill asks, in somewhat inartistic language, a foreclosure of the mortgages. The mortgagors contend that there cannot be in the same suit both a rescission of the cancellation and a foreclosure of the mortgages. They say that, "now, to foreclose these mortgages would be permitting it [complainant] to foreclose that which it was not the owner of and which was not in existence when the bill was filed. Furthermore, where the instrument is being given validity and the rights thereto are being first established by a decree of the court, in conscience and in equity, the defendant should first be afforded an opportunity to perform the obligations under those instruments before his right to do so should be barred and foreclosed by a decree in foreclosure." From the time the mortgages were created, the complainant was the equitable owner, at least to the extent already stated, and the mortgages have been in existence from the time they were executed. It is true that the complainant asks a decree that the attempted cancellation of the mortgages is null and void and that the mortgages may be reinstated as valid mortgages; but this prayer seems merely to anticipate the defense of payment. Neither the endorsement of a receipt on the mortgages nor the cancellation stamped on the record in the clerk's office had the effect of destroying the mortgages. *Dudley* v. *Bergen, supra; Dubois* v. *Schaffer, 23 N. J. Eq. 401,* and *Stimis* v. *Stimis, 60 N. J. Eq. 313,* were all suits for the foreclosure of mortgages which had been canceled of record. In each case the cancellation was set aside and the mortgage was foreclosed.

It may be that the mortgagors, Driscoll and Angelo Cassaro, when they learned that Meding had canceled the mortgages, assumed that the construction company had paid the debt thereby secured, and hence, that their property was relieved of the mortgage obligation. But there is no evidence that this is so, or that the mortgagors relied in the slightest

on the cancellation. It does not appear that the foreclosure of the mortgages in the present action would be inequitable.

Each mortgage, by its terms, secured the payment of $13,000 payable in monthly installments of $500 each, together with interest at six per cent., until November 14th, 1932, when the balance was payable.

The mortgages contained the usual clause whereby the entire principal sum became presently due at the option of the mortgagee in the event of a continued default in the payment of interest or installments of principal. Such defaults occurred long before the bill was filed. The difficulty is that the bill does not allege the acceleration clauses in the mortgages; it merely sets forth "that default has occurred under the terms of both of the mortgages above mentioned, both because of the non-payment of the interest and installments of principal evidenced thereby and because of the failure to keep the buildings erected on said mortgaged premises insured in favor of the mortgagee." The bill prays for a sale of the mortgaged premises to raise the amount found due to complainant, and further, that the defendants may be debarred and foreclosed of all equity of redemption in the premises. The answers of the mortgagors (on this branch of the case) merely deny the alleged default. I think that the mortgagors, despite the careless language of the bill, had sufficient notice that the complainants contended in this suit that the entire principal sum was due and payable because of the defaults in interest and installments of principal and that complainants sought a foreclosure to raise the entire amount secured by the mortgages. To grant to complainant the partial relief of establishing its title to the mortgages and ascertaining the amount due thereon and to deny a foreclosure, would merely compel complainant to bring another suit and would add to the expense not only of complainant but also of the mortgagors. Complainant therefore will be allowed to amend the bill so as to state the acceleration clause in the mortgages and in more particular language the defaults, and its election that the entire sum secured should be due. A decree of foreclosure will then be advised.

Complainant asks that the defendants responsible for the fraud be decreed to pay the amount found to be due. There is no evidence implicating Meding, the Driscolls, Angelo Cassaro, or his wife, in the fraud. Thomas J. Larson seems to have been the ring leader, but since he has not been served with process or appeared in the suit, there can be no decree against him. Salvatore Cassaro, called as a witness by complainant, admitted that he signed and gave to Larson the conditional sales contracts and accompanying "installation receipts" which were used to obtain $24,714.07 from the acceptance corporation; that his construction company never owned the properties mentioned in the contracts. On cross-examination by his own counsel, he said that these papers were mere blank forms when he signed them. I doubt it. An inspection of the contracts and of the receipts shows that Cassaro's signatures are so written as to avoid the typewriting at the foot of the contracts. But whether he signed before or after the contracts were filled out, is unimportant. He must have known, under the circumstances, that the papers which he signed would be used fraudulently to obtain money; he was in the business of constructing houses; he was an old customer of the refrigerating company. Throughout the hearing Cassaro was present in court but did not testify in his own behalf or present any proofs whatever. I find that he was a party to the fraud. Of course, he may not have known how much money Larson would try to get on these documents; he may have thought that Larson was aiming only at the amount, $10,000, that he was going to loan Cassaro; but this does not relieve Cassaro from the full consequences of the fraud. He is liable to complainant in the sum of $24,714.07 with interest from November 6th, 1930.

Here an interesting detail arises: The money which the construction company loaned on the mortgages was obtained in part on the Cassaro contracts and in part on the Matter contract. Cassaro had no share in the latter fraud and is not personally responsible thereon. But the mortgages, to the extent that they represent the fruit of the Cassaro fraud, are a security for the same debt for which Cassaro is personally

liable. If Cassaro should pay the company the full sum of $24,714.07, he would thereby satisfy the mortgages in part, and conversely, if the mortgages were paid in full, a part of that payment would have to be applied against the Cassaro debt. Thus the question arises, how much of the proceeds of the Cassaro fraud and how much money representing the Matter fraud went into the mortgages? As stated above, on November 14th the refrigerating company had in its bank account $7,895.11 from the Cassaro contracts and $9,456 from the Matter contract. I know of no valid presumption whereby withdrawals from the bank should be charged against one of these funds rather than the other. The mortgage money should, I believe, be considered as representing the two funds in the proportions which the amounts above stated bear to each other; that is to say, of the amount due on the Cassaro fraud, $4,617.82 is secured by the mortgages, and $5,531 of the proceeds of the Matter forgery is likewise secured.

The S. C. Construction Company was not a party to the fraud. Cassaro was the president and general manager of the company and may be presumed to have had authority in its behalf to borrow money from the refrigerating company to pay off the old creditors. But he certainly had no implied authority to execute for the construction company fictitious conditional sales contracts. But the construction company did receive $10,148.82 of the acceptance corporation's money and is responsible to it to that extent. *Stokes* v. *New Jersey Pottery Co., 46 N. J. Law 237.* This is the debt secured by the mortgages. The mortgagors had nothing to do with the fraud. To the extent that their property is applied to the reduction of the amount due complainant, they may have an equity of subrogation to the rights of complainant as against the construction company and Cassaro.

The refrigerating company was liable to complainant for the full amount obtained from complainant in the transactions which are the subject of this litigation, namely, $34,170.07, of which part is secured by the mortgages and the balance, $24,021.25, is unsecured. The receiver will be directed to allow as a general claim the sum last stated.