243 N.J. Super. 75 (1989)
578 A.2d 887
TRUSTEES OF THE CLIENTS' SECURITY FUND OF THE BAR OF NEW JERSEY, PLAINTIFF,
v.
CHARLES E. MILLER, DEFENDANT.
Superior Court of New Jersey, Chancery Division Passaic County.
August 2, 1989.
*77 Daniel R. Hendi, Deputy Counsel for Clients' Security Fund appeared. Kenneth J. Bossong, counsel for Clients' Security Fund, attorney.)
Jerome A. Vogel, receiver for defendant Charles E. Miller (Jeffer, Hopkinson & Vogel, attorneys).
Louis G. Karagias for New Jersey Division of Taxation (Robert A. Del Tufo, Attorney General of New Jersey, attorney).
John F. Geaney for defendant Charles E. Miller (Cole, Geaney, Yamner & Byrne, attorneys).
DWYER, P.J. Ch.
Jerome A. Vogel ("receiver"), receiver for Charles E. Miller ("Miller"), whose license to practice law has been revoked, has filed his final account for approval and instructions as to distribution.
Pursuant to a verified complaint filed under R. 1:28-8 on September 12, 1982, plaintiff sought the appointment of a custodial receiver for the entire estate of Miller, including his law practice. The said complaint recited that Miller had been suspended from the practice of law on September 3, 1982 and that plaintiff had received 14 potential claims against the Clients' Security Fund of the Bar of New Jersey ("CSF") related to the activities of Miller totaling over $900,000. By order dated September 21, 1982, Jerome A. Vogel was appointed the receiver.
The complaint stated that Miller had to defend a counterclaim for divorce and equitable distribution which Lois Miller filed in Miller's action to divorce her. The action was allowed to proceed.
The order of appointment provided in part:
(a) The Receiver was ..." appointed Custodial Receiver of the entire estate of Miller, including his law practice and is hereby directed to take possession of all books, papers and records of the defendant, which he can ascertain of the *78 law practice of the defendant, and anything of value whatsoever, and hold the same until the further order of this court, except that said Receiver shall have authority to take such steps with respect to the law practice of the said Charles E. Miller as may be necessary for the protection of the clients of Charles E. Miller, his creditors and his estate."
....
(e) Without further order of the court, the defendant, his agents, servants, and employees were restrained from selling, assigning, transferring, mortgaging or hypothecating or in any manner disposing of any of his assets or anything of value belonging to him, or from interfering with said Receiver in taking possession of and managing his property.
(f) "That on notice to the Receiver, all persons with claims against Charles E. Miller may take such steps in prosecution of their claims as they deem reasonably necessary to protect their interests up to but not inclusive of the attainment of a judgment and that any entry of any judgment against Charles E. Miller or against any of the assets in which Charles E. Miller has an interest shall be on applications to the Receiver on ten (10) days notice to the Receiver, or with the consent of the Receiver."
A copy of the order of appointment was published in October 1982.
The receiver filed a report, including an inventory of law-office furniture, in November 1982. The receiver stated that he had received files both open and closed of Miller but that there was no index or catalogue to them. There was no accounts receivable ledger or other records from which to determine what monies were due Miller. The receiver stated that he had an index created for the files. He made arrangements for the handling of the files, including agreements with attorneys who received the files for ultimate payment for the work done by Miller on the files.
With respect to the law office, the receiver recommended that the month-to-month tenancy be terminated and the physical assets sold.
The receiver further stated that the records revealed Miller had purchased a substantial home in the Village of Westhampton Beach, Town of Southhampton, Suffolk County, New York on September 25, 1981. The records also revealed that, on August 13, 1982, Miller conveyed said premises to himself and *79 Shirley Dayon as tenants in common giving as their address 360 East 72nd Street, New York, New York.
Receiver further stated that a lawsuit had been started in the County of New York against Miller charging that, while an attorney, he had received in the period April 1980 to January 1981 $75,000 from plaintiff for the purpose of investing in secured and low risk loans. Instead Miller had used said funds to pay part of the purchase price for the aforesaid home.
The receiver also stated that Miller with the advice of his own counsel had indicated a willingness to give a deed for his interest in the property.
The receiver filed a complaint for instructions based on his report and an order to show cause, directed to the CSF, the Passaic County Prosecutor, and Miller, was sought. The court granted it.
After hearing, an order was entered, which in relevant part authorized the sale of the law office property, obtaining ancillary letters of appointment within the State of New York and retaining a New York attorney to appear in the lawsuit to take appropriate action by way of defense to, and assertion of, claims to the real estate, and an order limiting the period within which creditors could assert claims to three months as well as the publication thereof.
On December 9, 1982, an order was published limiting the time within which creditors could file claims to three months from the date of publication of the order.
The summary of the account is stated as follows:

 Charges of the Receiver:
 a. Deposits into the checking account ............... $45,524.99
 b. Withdrawals ....................................... 45,509.37
 ___________
 $ 15.62
 c. Deposits into money market account ............... $68,960.06
 d. Withdrawals ....................................... 13,733.22
 ___________
 $55,226.84

*80
 Balance in hands of Receiver ........................ $55,242.46
 ==========
 Expenses incurred by Receiver in
 administration of the estate ..................... $18,134.00
 ==========

The receiver did not request a specific dollar amount for his services, but did submit a detailed affidavit of services and disbursements. The disbursements total $535.50. The remainder reflects time spent on the matter at the then-prevailing hourly rates. The total for both is $18,134.
Copies of the accounting were sent to the Internal Revenue Service, the New Jersey Division of Taxation, CSF, State of New Jersey, Department of Labor Office of Controller, and Miller. No objections were filed. The receiver did not include any schedule of claims that had been filed with him pursuant to the order limiting creditors' time to file.
The receiver did include a copy of a letter, dated March 13, 1984, addressed to Miller at the address for his law office from the New Jersey Department of Labor Office of the Controller enclosing a notice of claim for $242.55.
In response to the notice for a settlement of the account, the New Jersey Division of Taxation filed a copy of a certificate of debt ("COD") for unpaid New Jersey gross income taxes, dated January 31, 1984, aggregating $15,188 for taxes, plus interest and penalties of $5,146.90 for the years 1976, 1978, 1979, 1980 and 1981. Pursuant to N.J.S.A. 54:48-1 et seq. the COD had been filed with the clerk of the court and docketed as a judgment.
The letter stated $35,634.41 was due and payable.
Based on N.J.S.A. 54:49-1 et seq., it was claimed that the COD was a lien on all of Miller's property and the State was entitled to preference in the distribution of Miller's assets.
Based on Trustees, Clients' Sec. Fund of the Bar of New Jersey v. Beckman, 143 N.J. Super. 548, 364 A.2d 15 (Ch.Div. 1976), wherein the court said that so far as applicable the priorities set forth under the Bankruptcy Act should be followed, *81 the Division of Taxation claimed that it was also entitled to a priority under 11 U.S.C.A. § 507(a)(7).
CSF filed an affidavit listing a total of $337,788.43 which CSF had paid to those who had filed a claim based on monies that Miller had taken. There were 35 claims listed.
Under the rules and regulations of the CSF, the trustees have some discretion as to the amount to be paid on any one claim taking into account the available resources of the CSF. The trustees had set a maximum of $25,000 as the amount that could be paid on any one claim in 1982 and 1983.
There are eight claims on which the maximum amount was paid. Daniel R. Hendi, who signed the affidavit, by letter supplement stated that the amount of the losses above the $25,000 paid on each of the eight losses. The total is $1,003,435.68.
CSF bases its claim on the assignments and subrogation agreements it received from those to whom it paid money in satisfaction of all, or part, of the claims of those persons against Miller for embezzling their funds.
In short, CSF urges that to the extent the receiver is holding the proceeds of properties which Miller acquired by use of the embezzled funds such proceeds are not, and the property from which they were derived was not, Miller's property.
Tax liens do not attach to embezzled funds or the product thereof. First National Bank v. Hill, 412 F. Supp. 422 (N.D. Ga. 1976); Atlas, Inc. v. United States of America, 459 F. Supp. 1000 (D.N.D. 1978).
The embezzler is subject to income tax on the amount embezzled in the year of embezzlement. James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). A lien may be placed on the embezzler's property.
Since the embezzler is under a duty to repay to the persons from whom the funds were embezzled, such funds, or the proceeds thereof, are not the embezzler's property to which *82 a tax lien can attach. See First National Bank v. Hill, supra; Atlas, Inc. v. United States of America, supra.
The law of New Jersey is the same. See Van Blarcom v. Van Blarcom, 123 N.J. Eq. 110, 196 A. 468 (Ch. 1938), aff'd o.b. 124 N.J. Eq. 19, 199 A. 383 (E. & A. 1938). The beneficiary sued the estate of a deceased trustee who had taken a check signed in blank by a co-trustee for the purpose of paying interest to the beneficiary. Instead, the trustee made the check payable to himself and withdrew principal with which he built a house.
The trial court said:
It is well settled that persons who deal with trustees in transaction not connected with the trust are put upon inquiry, and accept payments from the trustee of trust funds in his personal transactions at their peril. Prall v. Hamil, 28 N.J. Eq. 66; Goodell v. Monroe, 87 N.J. Eq. 328 [100 A. 238].
Not only will the court impress a trust upon the property purchased with the misappropriated funds, but it will also give a personal judgment for any deficiency against the wrongdoers. General Motors Acceptance Corp. v. Larson, 110 N.J. Eq. 305 [159 A. 819].
A decree will be advised impressing a trust for the amount of the defalcation against the land and building in question and directing that any deficiency be paid by Irene Van Blarcom personally and the estate of Frank Van Blarcom. [123 N.J. Eq. at 112, 196 A. 468]
See also United States v. Pitoscia, 238 F. Supp. 135 (D.N.J. 1965).
N.J.S.A. 54:49-1 provides:
The taxes, fees, interest and penalties imposed by any such State tax law, or by this subtitle, from the time the same shall be due, shall be a personal debt of the taxpayer to the State, recoverable in any court of competent jurisdiction in an action in debt in the name of the State. Such debt, whether sued upon or not, shall be a lien on all the property of the debtor except as against an innocent purchaser for value in the usual course of business and without notice thereof, and except as may be provided to the contrary in any other law, and shall have preference in any distribution of the assets of the taxpayer, whether in bankruptcy, insolvency or otherwise. The proceeds of any judgment or order obtained hereunder shall be paid to the commissioner.
In addition to an action at law to collect the tax debt, the Legislature has also provided another method for collecting taxes. It is set forth in N.J.S.A. 54:49-12 which provides:
As an additional remedy, the Director of the Division of Taxation may issue a certificate to the Clerk of the Superior Court or to the Clerk of the Law Division of the County Court of any county, that any person is indebted under such *83 State tax law in such an amount as shall be stated in the certificate. The certificate shall contain a short name of the tax under which the said indebtedness arises. Thereupon the clerk to whom such certificate shall have been issued shall immediately enter upon his record of docketed judgments the name of such person, and of the State, the address of the place of business where such tax liability was incurred, if shown in the certificate, the amount of the debt so certified, a short name of the tax, and the date of making such entries. The making of the entries shall have the same force and effect as the entry of a docketed judgment in the office of such clerk, and the director shall have all the remedies and may take all of the proceedings for the collection thereof which may be had or taken upon the recovery of a judgment in an action, but without prejudice to the taxpayer's right of appeal.
This court does not interpret the above mentioned statutes to change the common law rights of persons, from whom money or other funds have been embezzled, to recapture those funds from the embezzler in an action at law or by means of a constructive trust in equity where the funds have been used to purchase property.
This court concludes that the liens created under said statutes only apply to the embezzler-taxpayer's own property and not the embezzled property or the proceeds thereof.
Since the CSF is in the position of the person whose funds were embezzled by Miller, to the extent of $337,788.43 paid by it, it is entitled to any funds held by the receiver allocable to the embezzled funds. The time period in which the funds were embezzled, and the expenditure made, make it unnecessary to trace each check.
The receiver in a certification dated October 18, 1983 stated the following concerning the real estate on Long Island. Under the contract of purchase dated in 1981 Miller had agreed to purchase the real estate for $210,000. Payment was to be made by: (1) a cash deposit of $10,000 on signing of the contract, (2) an additional $10,000 deposit on or before August 14, 1981, (3) assuming a first mortgage of $54,609.70, (4) giving a purchase money mortgage for $90,000, and (5) payment of $45,390.30 in cash at closing.
*84 The first mortgage called for a monthly payment of $564.09 and the second mortgage, a monthly payment of $1,479.70. Both were direct reduction loans.
Miller received title by deed dated September 25, 1981 which deed was recorded. By deed dated August 13, 1982 and recorded, Miller conveyed to himself and Shirley Dayon as tenants in common.
In the aforementioned suit in New York County, New York, plaintiff, in that action, recovered a judgment in the amount of $64,350 against Miller. It was also adjudged that Miller held title as a constructive trustee for the benefit of plaintiff.
Shirley Dayon had filed an affidavit in which she stated that she had made certain mortgage payments, paid real estate taxes, and paid for improvements. She attached a schedule listing the dates and amounts of payments and the source of funds for the payments. The total was $31,379.06. The source of funds were from persons other than Miller.
She further stated that the receiver told her that Miller had purchased the real property with funds embezzled from his clients. She indicated a willingness to join in a deed for the sale of the real property provided that she received $31,379.06. The receiver stated that Miller was also willing to execute a deed for the sale of said real estate.
The receiver reported that the real property had been appraised. During the June to September 1983 season, the property had been rented for $4,000 a month but no offers had been received to buy it above a $300,000 appraised value. The receiver further reported that he had received one offer to buy at $300,000 subject to a 5% brokerage commission.
The receiver cautioned that an update title search had not been done so that other liens might emerge. He recommended sale rather than using other assets to pay mortgages, taxes, etc., during the off-season period.
*85 A form of contract of sale, settlement and forbearance agreement with Dayon was also presented with the certificate.
An order to show cause was issued directed to Miller, the CSF and anyone else who had filed a claim pursuant to the order to limit creditors. Proof of service reflected no one had filed a claim in response to the order to limit creditors. After hearing, the court entered an order authorizing the sale of the real property for $300,000 with any claims of record to attach to the proceeds.
In May 1984, the receiver reported that the real property had been sold but that a mechanics' lien for $35,000 had been discovered. The receiver further reported that a settlement had been reached in which the claimant would take $17,500.
The receiver stated that he could not defend against the claim without the testimony of Miller. Miller, by that time, had been convicted in the criminal court and was incarcerated. Miller advised the receiver that he had no opposition to the settlement. The court approved the settlement.
The account reflects the receiver was paid $989.18, on February 24, 1984, by the person who rented the property and $14,364.40, on May 1, 1985 by the attorney for plaintiff in the New York lawsuit for a total of $15,353.58. The account also reflects that the receiver did not have to obtain ancillary letters of administration or retain a New York attorney.
The court has reviewed the closing statement for the sale of the real property. It shows that, after credits to the buyer and satisfaction of mortgages and other claims, there was a net of $32,720.60. This was held in escrow because of an open lien of record. It was from that escrow that $17,500 was paid and another claim was compromised for $700. There were additional disbursements of $156.20 leaving $14,365.40.
In addition to the $55,390.30 that Miller put into the real estate, there was $13,438.36 paid on the first mortgage and $35,314.79 paid on the second mortgage, between September 1981 through September 1983, for a total of $48,753.15. Of *86 that amount based on the schedule of Shirley Dayon, she paid $16,350.12 leaving a balance of $32,402.83.
The receiver in the accounting shows that the subject premises were rented at $4,000 a month for the summer of 1983. The rent was used to pay the real estate taxes and the monies due on the mortgages and other expenses. The mortgage payments for that period were $6,102.65. The court deducts that amount from the total paid to establish what Miller paid. The balance is $26,300.18.
The court concludes that Miller put $81,690.48 into the real property. The New York Supreme Court entered judgment against Miller for $64,000 and imposed a constructive trust for that amount in favor of plaintiff. If that amount is subtracted from the total, there is a balance of $17,690.48.
There are indications that Miller spent other monies on the real property for taxes, insurance, decorating and improvements. From available information, this court concludes that Miller used the proceeds of embezzled funds to make those payments.
The court concludes that the $14,364.40 received from the sale of the real estate is the produce of the embezzled funds; it is not Miller's property and tax liens do not attach to it.
The receiver also received the excess of $989.18 from rent paid over expenses incurred for operations of the property during the period June 1, 1983 to September 15, 1983. The rental agent's accounting is included on an exhibit.
Based on the facts herein, Shirley Dayon, prior to the rental period, had agreed to: release her interest if she were paid what she had contributed and make no claim for the rent excess, waive any right she had to such excess, the amount from the embezzled funds, for which CSF holds assignment and subrogation rights, which exceeds the return it will get from the sale. The court concludes that the constructive trust should include the $989 of excess from the rents. See Scott, *87 The Law of Trusts (3 ed. 1967) § 509, "Innocent Converter," which states:
We have seen that where an intentional converter of property acquires other property in exchange for it, the owner of the property not only is entitled to enforce an equitable lien upon the product, but he may at his option charge the converter as constructive trustee of the product. To make the converter accountable for any profit which he makes and chargeable with any loss he incurs is a salutary rule which should have some deterrent effect upon those who would meddle with the property of others.
[Id. at 3593]
The court concludes that the $989 should be treated the same as the $14,364.40, so that there is a total of $15,363.40. The court concludes that this sum is not the property of Miller.
With respect to the other items reflected in the receiver's accounting, he reports that $11,000 was received from the sale of the office equipment.
An inventory and appraisal report stated a value of $14,819. The typewriters and copying machine, listed for a total value of $4,900 in said report, were on lease. The purchasers took over the leases on that equipment. The law books were not included in that appraisal but were subject to a lien of $4,500 held by the supplier. The purchasers made their own arrangements with the holder of the lien. Based on available information, the court finds that the balance of the equipment in the office predates the embezzlement for which CSF has made payment and hence should be treated as Miller's property.
With respect to six payments received on six files which the receiver received but were not completed, the receiver states that all payments received were for fees for work which Miller had done but had not billed. The court finds that such funds are Miller's property. The total of these is $20,345.41. They were all deposited in the receiver's checking account prior to August 25, 1983.
The accounting also reflects the receiver collected small balances remaining in checking accounts in the name of Miller as well as small balances of deposits in accounts with government *88 offices to which fees could be charged. Based on the available information, the court lacks sufficient evidence to find that those funds are derived from the embezzled funds here in question. The court concludes that they should be treated as Miller's property. The amounts were $100 or less. They were deposited in the checking account.
On August 23, 1983 the Receiver transferred $30,594.02 into a money market account at the bank of deposit.
When funds from the rental and sale of the real estate were received, they were deposited directly to the money market account.
Without detailing all the activity in those accounts, the court concludes same are basically transfers from one account to another, charges for service fees, and earnings of interest on the money market account.
For purposes of allocation of interest, the court concludes that the interest earned based on the proceeds of the embezzled funds should be allocated to those amounts. All the other interest should be allocated to the funds representing Miller's property.
The receiver filed a supplemental affidavit reflecting receipt of a check for $37 from New Jersey for a refund of 1987 taxes and payment to the accountants of fees for preparation of 1988 federal and state tax returns. The court approved the supplement to the accounts.
The receiver lists, after the balance in the hands of the receiver of $55,242.46, as a separate item:
(e) Expenses incurred by Receiver in the administration of the Estate $18,134.
This court analyzed the supporting documentation in an affidavit of services listing the dates and kinds of services rendered, whether Vogel or an associate in his office performed the service, and the dollar amount established by the billing rate of the firm in the year the service was rendered. The total time charged listed is $17,599. Disbursements for postage, express *89 delivery telephone, etc., is $535.50. The Receiver has not asked for a specific amount but left any allowance to the discretion of the court. The court approves the reimbursement of the amount of out-of-pocket expenses of $535.50 and $17,500 as an allowance. The total is $18,035.50.
This opinion does not fully reflect the involvement of the receiver in all matters. There was a bankruptcy proceeding involving clients of Miller who charged that Miller had taken the proceeds of a bank loan which was intended to pay off existing mortgages and finance the construction of a new building. Miller disputed some of those allegations.
Some attorneys made claims to files that Miller had done work on but would not agree to any arrangement to pay for that work when the matter was concluded.
Earlier in this opinion this court referred to: the need to organize Miller's files, the negotiations with attorneys to whom files were transferred for payment for the work done by Miller, and the work entailed in getting the real estate in New York sold.
The receiver has spent time in preparing to file the accounting. The receiver's efforts have created the funds which are in the custody of the court. The receiver has received no payment since he commenced working on the matter in 1982.
The balance for distribution is:

 $55,242.46
 18,035.50
 __________
 $37,206.96
 ==========

The administration expenses are deducted first even when the bankruptcy guidelines are followed. Beckman, supra, and In re Harry Kampelman, 165 N.J. Super. 352, 398 A.2d 152 (Ch.Div. 1979). Not subject to tax liens for the reasons stated above is $15,363.40 allocable to the proceeds of embezzled funds. See also 14 Mertens, Law of Federal Income Taxation (1989), 354 A. 11, "Types of Property Affected by Tax Liens":

*90 The Government cannot have a valid lien on property which the taxpayer obtained by unlawful means. If, under state law, an embezzler does not own the property obtained with embezzled funds, the tax lien cannot attach to such property. [Id. at 39]
With respect to the remaining $21,743.56, the court, after thorough review of all materials filed in connection with the accounting and in the file, concludes that the record is incomplete to make a determination.
With respect to the Division of Taxation's claim based on a COD for $35,634.41, CSF urges that it should be ignored because it was entered in violation of paragraph (f) of the order dated September 21, 1982, prohibiting the attainment of judgments without leave of this court. Upon the appointment of the receiver under the aforesaid order, all the property of Miller was in custodia legis and no one could interfere with it. See Generotzky v. Barnay Hotel Company, 85 N.J. Eq. 63, 95 A. 865 (Ch. 1915); Hoffman v. Kahn, 119 N.J. Eq. 171, 181 A. 527 (Ch. 1935); 65 Am.Jur.2d, Receivers, § 168, "Interference by suit proceeding, levy, sale or enforcement of lien;" Kneisel v. Usurus Motor Corp., 316 Ill. 336, 147 N.E. 243 (S.Ct. 1925) see annotation at 39 A.L.R. 8 (1925); 20 N.J. Practice, (Skills and Methods) (2 ed. 1973) § 149.
In Johnson v. Smith, 297 N.Y. 165, 77 N.E.2d 386 (Ct.App. 1948), cert. den. 335 U.S. 824, 69 S.Ct. 47, 93 L.Ed. 378 (1948), the majority of the Court of Appeals of New York refused to apply the doctrine of in custodia legis when the county in which the real estate was located had enforced tax liens against the real estate that a receiver in partition had possession of, but not title to, the subject real estate. In doing so, the New York Court of Appeals declined to follow the precedent set in I/M/O Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689 (1893). In the Tyler case, the United States District Court for South Carolina had appointed a receiver in an equity receivership for a railroad that operated in 18 counties in South Carolina. Upon the receiver's application to pay the taxes due the various counties which he conceded and challenge the additional taxes before the *91 District Court, that court approved the application and enjoined the enforcement of the tax lien. Before the hearing, the counties levied the taxes for the next year, the receiver paid the amount he conceded, and Tyler levied and executed for the balance due by chaining several box cars to the tracks and disrupting the railroad. The District Court held him in contempt, imposed fines and ordered him held until he paid the fines and purged himself of contempt. An application for a writ of habeas corpus was denied by the circuit court of appeals and the United States Supreme Court.
In I/M/O Tyler, supra, Justice Fuller, in part, stated:
The general doctrine that property in the possession of a custodia legis, and that unauthorized interference with such possession is punishable as a contempt, is conceded; but it is contended that this salutary rule has no application to the collection of taxes. Undoubtedly property so situated is not thereby rendered exempt from the imposition of taxes by the government within whose jurisdiction the property is, and the lien for taxes is superior to all other liens whatsoever, except judicial costs, when the property is rightfully in the custody of the law, but this does not justify a physical invasion of such custody and a wanton disregard of the orders of the court in respect of it. The maintenance of the system of checks and balances characteristic of republican institutions requires the co-ordinated departments of government, whether Federal or state, to refrain from any infringement of the independence of each other, and the possession of property by the judicial department cannot be arbitrarily encroached upon, save in violation of this fundamental principle.
The levy of a tax warrant, like the levy of an ordinary fieri facias, sequestrates the property to answer the exigency of the writ; but property in the possession of the receiver is already in sequestration, already held in equitable execution, and while the lien for taxes must be recognized and enforced, the orderly administration of justice requires this to be done; and a seizure of the property against its will can only be predicated upon the assumption that the court will fail in the discharge of its duty, an assumption carrying a contempt upon its face. [149 U.S. at 183, 13 S.Ct. at 790, 37 L.Ed. at 695]
In the Johnson case, supra, the majority of the court of appeals said:
In the two cases last cited, we rejected a contention that the failure of a county treasurer to obtain court leave and approval for a tax sale invalidated such a sale where the property was held by trustees appointed by the Supreme Court in reorganization proceedings brought pursuant to the Schackno and Mortgage Commission Acts, McK. Unconsol. Laws, Sec. 4871 et seq. Those decisions apply with equal force here; insofar as the problem before us is concerned, there is little to differentiate the receiver in a partition suit from a *92 trustee in a Schackno or Mortgage Commission Act proceeding. See Matter of Bond & Mortgage Guar. Co., 288 N.Y. 270, 277, 43 N.E.2d 38, 41. In the absence of specific statutory provision restraining tax collection agencies during the pendency of the action, or during the receivership, there is no basis for a claim that the county or its treasurer should have sought permission from the court before selling the property for unpaid taxes or delivering the tax deeds.
Paramount and vital is the circumstance that, in selling the property, the county treasurer acted solely in accordance with the mandate of the statute. It may well be that court approval is required if in possession is a statutory receiver or trustee or a receiver or trustee appointed by a court pursuant to a statute  such as the Federal Bankruptcy Act, 11 U.S.C.A. Sec. 1, et seq.  granting extremely broad powers. Quite apart from any other consideration under the Bankruptcy Act, title to the property vests in the trustee (Bankruptcy Act, Sec. 70; U.S.C.A. tit. 11, Sec. 110). A receiver in partition, on the other hand, obtains no title to the property (Rinehart v. Hasco Building Co., 153 App.Div. 153, 138 N.Y.S. 258, affirmed 214 N.Y. 635, 108 N.E. 1106); title remains vested in the owners who are the parties to the partition action. As is evident from the order of appointment, the receiver is given merely the right to manage the premises on behalf of those owners until the action has been concluded. The court, by appointing a receiver in a partition, undertakes, not to preserve the rights of the parties in the property against the world, but simply to preserve their rights as against each other.
....
To hold, as the Appellate Division has, that the county treasurer must obtain permission from the court before selling for nonpayment of taxes so as to permit the court to "determine whether the property should be sold or held for the benefit of parties interested and the municipality", 272 App.Div. 6, at page 9, 69 N.Y.S.2d 68, at page 71, is to assume the existence of a power in the court to prevent the tax sale or postpone it indefinitely. The consequence of such a decision would be the creation of tax exemption by judicial fiat in favor of receiver-held property, perhaps as to amount, certainly as to time and method of payment  a result clearly contravening the constitutional provision that "Exemptions from taxation may be granted only by general laws" N.Y. Const. art. XVI, Sec. 1. On the other hand, if a court were under the necessity of granting leave to a county treasurer  because the statute directs him to sell  the application to the court would be but an empty and futile gesture, and it should not be required. Or if a regard for propriety does demand it  and I doubt that it does  failure to comply with such a formality should not result in voiding the sale.
....
No public policy is to be served by requiring the court  because of a supposed involvement of its dignity  to aid taxpayers in avoiding or delaying the payment of taxes owing by them and necessary for the carrying on of *93 government. In the present case, the taxes were not paid, and the county treasurer, in selling the property under compulsion of the Tax Law, complied strictly with every applicable provision. The sales as well as the tax deeds and the subsequent conveyances, being valid and proper, are immune from attack. The owners of the property and the receiver were granted a privilege by statute to redeem; they chose not to avail themselves of it. [3 A.L.R.2d at 891-893]
The author of the annotation in that case expressed the following opinion:
The only serious attempt at reconciling those two opposite views was made in Johnson v. Smith (1948) 297 N.Y. 165, 77 N.E.2d 386, 3 A.L.R.2d 888 cert. den. (1948) [335] U.S. [824], 93 L.Ed. (Adv. 23), 69 S.Ct. 47). The distinction suggested in this case is to the effect that court approval is required where in possession is a statutory receiver or trustee, or a receiver or trustee appointed by a court pursuant to a statute granting extremely broad powers to the trustee or vesting the title to the property to him, while no such consent is necessary where the reason for the custody is the preservation of the rights of the parties in the property as against each other and not against the world.
Despite the fact that the rationale behind the two conflicting views seems to indicate a more fundamental difference going to the roots of our concept of interrelationship between the various functions of government, a perusal of the actual decisions in the light of the distinction suggested in the Johnson Case shows that they can be classified, as a whole, in accordance with the theory advanced therein. Such a distinction has much to recommend it. [Id. at 908]
This court concludes that, under both Tyler and Johnson, it would have had to either order the receiver to pay or let the taxing authorities proceed to judgment and levy on Miller's property; hence, the action in obtaining the COD should not be invalid.
With respect to claimants other than taxing authorities, the court concludes that to insure fairness of treatment among claimants and to avoid substantial confusion and embarrassment, cf. Conover v. Ruckman, 33 N.J. Eq. 303 (E. & A. 1880); Crane v. Freese, 16 N.J.L. 305 (S.Ct. 1837), they must apply to the court having custody.
In Western Sav. Fund Soc. of Phila. v. Goodman, 103 N.J. Super. 307, 247 A.2d 151 (Ch.Div. 1968), in deciding distribution of surplus funds after a sale of real property pursuant to a foreclosure judgment, the court, in deciding whether a claimant who had levied upon the funds in the hands of the sheriff based on a judgment subject to the mortgage, said:

*94 In Conover v. Ruckman, 33 N.J. Eq. 303 (E. & A. 1880), the court explained the effect of the holding in Crane v. Freese, supra, and stated:
"* * * [T]he court also adjudged that the writ of attachment was well served on the moneys due the plaintiff in the execution and in the sheriff's hands, as rights and credits of the defendant in attachment in the hands of the sheriff; and the duty of the officer, in that event, was pointed out. He was to obey the command of the writ of execution under which he raised the money  bring the money into the court out of which the execution issued, and give notice to the plaintiff in the attachment, or to the creditors, that he had done so; and the court would then control the application of the funds and protect its officer in the discharge of his duty."
See also Hoffman v. Kahn, 119 N.J. Eq. 171 [181 A. 527] (Ch. 1935); Bernstein v. New Jersey Bankers Securities Co., 115 N.J. Eq. 347 [171 A. 145] (Ch. 1934).
In 33 C.J.S., Executions § 55 c., p. 187 (1942), it is stated:
"The doctrine is well settled that money realized by an officer by virtue of an execution, or money paid into court, cannot be levied on as the property of the judgment creditor, it being regarded as in custodia legis."

N.J.S. 2A:17-39, upon which is based the authority to give priority to a judgment creditor who first levies, was not intended to be operative in a case such as the one at bar. Once the funds are paid into court it is only a matter of proper distribution; not a matter of securing a lien or obtaining a priority. The confusion or embarrassment referred to in Crane v. Freese, supra, was with respect to dealings between courts; not in determining priorities where the liens and the priorities thereof were already established before the court's officer received the moneys and they came under the control of the court.
No doubt when the surplus moneys arose in this case, they stood in the place of the land, Vineland Savings & Loan Ass'n v. Felmey, supra [12 N.J. Super. 384, 79 A.2d 714 (Ch. 1950)]; otherwise, judgment creditors would have lost their liens completely. The liens which existed automatically attached to the surplus funds.
In a case such as here presented, where money is paid into court, it seems that since a judgment entered even after the deposit but before distribution would establish the right to participate in the fund, equitably a levy upon it should not be recognized as effecting a priority to payment against other lien holders.

Crane v. Freese went no further than to establish that where a levying judgment creditor had caused a fund to be placed in the hands of the sheriff, in which he had an interest, a levy upon his rights and credits therein by his own judgment creditor would be recognized. In such case the officer of the court would be guided by the court in making disbursement, and the officer would thereby obtain the protection of the court.
In the case at bar, for all practical purposes the mortgagor had no interest whatever in the fund. There was no attachable right or credit.

*95 ....
Why, therefore, should this court countenance a race to secure a priority when the method of acquiring it, to wit, by issuing execution and levying upon a fund in court, is only an empty gesture from the standpoint of actually reducing the funds to possession? Under our modern concepts, equitably a priority in payment should not rest upon an artificial, hollow and unsubstantial act.
Hone, in this instance, knew that its levy would not result in the delivery of the funds or any part thereof to it as a direct result of this action. It knew that it would in no way accelerate the distribution of the funds either to it or any others. Its sole and only purpose was to endeavor to obtain a priority in payment to which it would not otherwise be entitled.

Vineland Savings & Loan Ass'n v. Felmey, supra, is clearly distinguishable from the case at bar because in this case the levy was not made until after parties already entitled to distribution had moved to obtain the release of the deposited funds.
Although N.J.S.A. 2A:17-39 encourages the "vigilant" judgment creditor to gain "the proper effect and fruits thereof," it does not contemplate that a party should be rewarded by causing a levy to be made after judgment creditors already have initiated proceedings to obtain distribution. Cf. Bogert v. Lydecker, 45 N.J.L. 314 (Sup.Ct. 1882); Williams v. Gilbert, 37 N.J. Eq. 84 (Ch. 1883) and Lovejoy v. Lovejoy, 31 N.J. Eq. 55 (Ch. 1879).
These other judgment creditors, in pursuing their rights to distribution, were even more vigilant than Hone, and are entitled to the "proper effect and fruits of their vigilance." Their applications and efforts toward securing payment were tantamount to a levy. Confusion and embarrassment might well result if the court should uphold Hone's claim to priority. [Id. at 313-316, 247 A.2d 151]
Under 26 U.S.C.A. § 6036, a receiver is under a duty to file a notice of his appointment, whether by a federal or state court, pursuant to the regulations implementing that statute, Reg. 3016036. The giving of that notice affords certain rights to the I.R.S. and have an impact on the statute of limitations that can run against the I.R.S. 14 Mertens, supra, § 354.08, "Statute of Limitations."
Under N.J.S.A. 54A:8-6(d) receivers are required to give similar notification to the Director of the Division of Taxation, but the court, in its own research, has not found any implementing regulations.
In the absence of proof of claims from the respective taxing authorities, since formal statutory notices were not filed, the court directs that such notices be filed and the court will allow *96 60 days for the filing of proofs of claims from the date said notices are served upon the respective authorities.
A copy of this decision should be served with the notice.

Addendum.
Subsequent to the decision set forth above, the receiver did send the statutory notices to the I.R.S. and the Division of Taxation.
The I.R.S. did not respond. The Division of Claims Section of the Department of Law and Public Safety on behalf of the Division of Taxation filed a proof of claim based upon a certificate of debt ("COD") dated January 31, 1984 in the amount of $13,384.90.
A notice and demand for payment had been sent to Charles E. Miller, 141 Ridge Avenue, Passaic, New Jersey 07055 by certified mail, return receipt requested, on December 30, 1983. It was returned by the Post Office marked addressee moved  no forwarding address. The proof of claim was for $42,809.21 for tax years 1978, 1979, 1980 and 1981.
CSF urged that the Division of Taxation could not rely upon the COD unless the Division of Taxation proved that it followed the notice and demand provisions of the State Tax Uniform Procedure Act, N.J.S.A. 54:49-5 and -6. CSF also cited N.J.S.A. 54A:9-1 and particularly 2(a), (b), (c). CSF urged that N.J.S.A. 54:49-12, which provides that the Director of the Division of Taxation may file a certificate of debt for filing with the appropriate court officials which shall have the force and effect of a docketed judgment, by its express language in the beginning "as an additional remedy," means that the Director of the Division of Taxation must still comply with the notice and demand provisions set forth in the other sections of the statute.
CSF pointed out that in the 1953 revision of the statute the words "alternate remedy" were deleted from the operative words of the statute.
*97 The receiver pointed out that Charles E. Miller did not live at 114 Ridge Avenue, Passaic, New Jersey at the relevant times in 1983 and 1984 but at the state prison in Leesburg, New Jersey. The receiver had been filing tax returns with the Division of Taxation with respect to Charles E. Miller.
CSF also pointed out that the procedures followed by the Division of Taxation presented questions whether Miller and the receiver had prevented either of them from taking advantage of the tax amnesty available for a short period of time.
The matter of taxes was resolved by allowing the Division of Taxation to collect the principal amount of taxes, no penalties, and interest at the judgment rate of interest.